## THE M. VANDERCOOK.

*(District Court, D. New Jersey. June 30, 1885.)*

1. SALVAGE SERVICE—HELL GATE—TOWAGE—AWARD.
    On May 4, 1884, the M. Vandercook was bound through Hell Gate to the city of New York, the tide running a strong ebb. When she reached a point in said Hell Gate abreast of Flood rock she broke her shaft and lost her propeller, by reason of which she became perfectly helpless, and was in danger of and would have gone ashore, and filled and sunk, as the channel of Hell Gate is dangerous, full of rocks, through which the tide rushes with great velocity,

and she could not anchor therein. The tug Gratitude went to her rescue, and towed her safely to Jersey City; in so doing subjecting herself to the risk of getting ashore and sinking. *Held*, a salvage service, but one of low grade, and that the amount of $60 contracted to be paid was a fair compensation for the service rendered by the Gratitude.

2. SAME—ASSIGNMENT OF CLAIM FOR SALVAGE—MARITIME LIEN.

The assignment of a debt (such as claim for salvage agreed to be paid) secured by a maritime lien will carry the security with the claim when the parties so intend.

3. SAME—PRIORITY OF LIENS.

A claim for salvage service has a priority of rank over claims for repairs and materials.

4. MARITIME LIEN—MASTER'S CLAIM FOR WAGES.

A claim of a master for wages is not an admiralty lien.

5. SAME—NEGLIGENT TOWAGE—TORT—PRIORITY OF LIEN.

A claim for damages to a vessel and her cargo, caused by the negligence of a tug while towing her in pursuance of a contract, has priority of payment over liens for repairs and supplies to the offending vessel.

6. SAME—SUPPLIES—REPAIRS.

Claims for supplies and repairs stand in the same grade, and in this case are to be paid *pro rata* out of the residue of the fund in court after payment of the claims for salvage, and for the tort of the tug.

In Admiralty.

*Alexander & Ash,* for libelants Davies & Russell.

*Carpenter & Mosher,* for libelants Jas. McWilliams and others.

*Bedle, Muirheid & McGee,* for libelant Whitman B. Littlefield, and other libelants.

*See Bros.,* for other libelants.

NIXON, J. A number of libels have been filed against the steam-tug M. Vandercook, and the commissioner has reported the amounts found due upon the respective claims. The boat was sold, and the net proceeds are now in the registry of the court. The amount, after the payment of liens for wages, is $1,974.41, which is wholly inadequate to pay all the claims found due; and the question to be determined is, in what order shall they be liquidated, and which, if any, are entitled to preference?

1. We have the petition of Davies & Russell, praying that $60 be awarded to them, out of the proceeds of the sale, for a salvage service rendered to the tug. Two objections are made to the allowance: (1) Because the service was not, in fact, a salvage service; and (2) because the petitioners are assignees of the party who performed the service, and therefore have no lien.

As to the first, no evidence has been taken, but the respective parties have agreed that the statement of the service, as set forth in the petition, shall stand as true, and in the place of evidence. It is there alleged that on the fourth of May, 1884, Eunice A. Dooley and G. N. Milliken were the owners of the steam-tug Gratitude; that on that day the tug M. Vandercook was bound through Hell Gate to the city of New York, the tide running a strong ebb; that when she reached a point in said Hell Gate about abreast of Flood rock she broke her shaft and lost her propeller; that by reason of said accident she be-

came perfectly helpless, and was in danger of and would have gone ashore, and filled and sunk; that Hell Gate is a dangerous channel, full of rocks, through which the tide rushes with great velocity, and in which the said tug could not anchor, and was entirely at the mercy of the tide; that while in this helpless condition the tug Gratitude went to her assistance and took her in tow, rescued her from her peril, and safely brought her to Jersey City; that the Gratitude, in rendering the services aforesaid, subjected herself to the risk of getting ashore and sinking; that the owners of the M. Vandercook agreed to pay the owners of the Gratitude for said salvage services the sum of $60, no part of which has been paid, although payment has been demanded, and that before the commencement of said proceedings the owners of the tug Gratitude duly assigned their claim, together with their lien upon the M. Vandercook therefor, for a valuable consideration, to said petitioner.

It appears from this that the tug was in some peril, was helpless from an accident to her machinery, and was in a dangerous locality, and the service rendered was necessary for her safety. It is thus brought within the category of a salvage service, but having none of the ingredients which warrant a large allowance. A liberal charge for towage would almost meet the case. Under the circumstances, $60 would not seem to be unreasonable, especially as that was the sum which the parties interested agreed upon at the time as a proper compensation.

As to the second, there is no reason in principle why the assignment of a debt, secured by a maritime lien should not carry the security with the claim, where the parties so intend. The debtor is not injured by it, and the creditor is greatly benefited. The question was carefully examined by Judge Lowell in *The Sarah J. Weed*, 2 Low. 555, and I see no good reason to doubt the correctness of his conclusion, that in the assignment of a maritime lien the rights and remedies of the original creditors pass to the assignee. See, also, *The Liberty No. 4*, 7 Fed. Rep. 231. A claim for salvage service has a priority of rank over claims for repairs and materials, and a decree must be entered for the payment of the $60, and costs.

2. The next inquiry is whether the claim of Whitman B. Littlefield for wages is an admirality lien which is entitled to payment out of the fund in the registry. In his testimony he describes himself as the mate of the tug; but it is alleged by the contesting libelants that he was in fact the master, and as such has no lien for his wages. He appears in that relation on the enrollment of the vessel, and on taking out their papers in the custom-house he makes the usual master's oath. But it is claimed that his position, and the usual course of business of these tugs, are peculiar, and that the reasons which are ordinarily assigned why the master should have no lien for his wages do not apply in his case. He makes no contracts; he has no voice in procuring business or freights; he receives no moneys for tow-

age service or for freights; but is in all these respects subject to the control of the owner. There would be much force in this if the receipts of the earnings of the boat were the only ground on which the law denies a lien to the master. Following the rule of the English admiralty, the courts of this country, from the earliest times, have held that the master should not be classed with the seamen in having the privilege against the ship for the payment of wages. Various reasons have been assigned for this by elementary writers and learned judges. Mr. Justice STORY, in *Willard* v. *Dorr*, 3 Mason, 92, says that it has generally been ascribed to the fact that the master, when he contracts, trusts to the personal credit of the owner,—not quoting, but doubtless following, Sir WILLIAM SCOTT, in *The Favourite*, 2 C. Rob. 232, who states that the master, when he hires, is supposed to stand on the security of his personal contract. In *The Grand Turk*, 1 Paine, 73, LIVINGSTON, J., remarks that, in addition to the foregoing reason, the master is not allowed a lien for his wages on account of the inconvenience and expense to which owners might be subjected if, in every dispute with the master, he could take their vessel out of their hands and thus compel them to submit to improper charges.

I am of the opinion that, under the circumstances of the case, the libelant must be treated as the master, and that his claim for wages is not an admiralty lien.

The claim of James McWilliams and others for damages to libelants' boat, Two Brothers, and her cargo, caused by the negligence of the tug in towing, raises the question whether such a claim has priority of payment over liens for repairs and supplies to the offending vessel. The libel alleges that the M. Vandercook took the Two Brothers in tow at Jersey City on December 17, 1884, to safely tow her, with other boats, to New Haven, in Connecticut; that the Two Brothers was placed on the port side of the tug, and two other boats on the starboard side; that the tug and tow proceeded up the East river, and at about 5 o'clock A. M. reached a port on East river near the foot of North Ninth street, Brooklyn, where the tug was put in to pick up other boats for the tow; that at the time the weather was clear and a flood-tide running, and that in proceeding to said pier the steam-tug, in rounding the tow to, was so carelessly and negligently managed that libelants' boat was brought violently in collision with the dock or pier below the foot of North Ninth street, the port side of said boat striking the corner of the pier about 15 feet from her stern, breaking in her side and deck, and twisting the boat out of shape, and causing her to leak badly; that the pumps were manned and the boat taken into the slip, when it was found that she had three feet of water in her hold; that by constant work the water was reduced by 2 P. M. to about 18 inches, and the said boat and cargo were towed by another tug back to Jersey City, where, for the safety of the boat and cargo, she was put upon the flats. The parties have stipu-

lated that the allegations of the libel are true, and that the damages amount to $821.76, as reported by the commissioner.

Did these damages arise *ex contractu* or *ex delicto?* The proctors for the contestants insist that it is in no sense a collision case, in which, it is conceded, the claim would be of a higher rank and take preference over claims for supplies and repairs. Their contention is . that the action of the libelant is for damages sustained by reason of a breach of a towage contract, and hence has no priority over any other claim founded on a contract; and they rely upon the cases of *The Samuel J. Christian,* 16 Fed. Rep. 796, in the Eastern district of New York, and *The Grapeshot,* 22 Fed. Rep. 123, in the Southern district of New York, to sustain their view.

I have so much respect for the opinion of these learned judges in admiralty causes, and am so fully persuaded of the importance of a harmony of judgment and procedure in districts so contiguous, that I have examined these cases with great care, and am sorry that I am not able to concur in the conclusion to which they have arrived. They do not seem to me to be consistent with other decisions in the same districts, or in other districts, or in the supreme court of the United States.

The nature of a suit in the admiralty, brought to recover damages for injuries done to a vessel by negligent towage, was fully discussed before Judge BLATCHFORD in the case of *The Brooklyn,* 2 Ben. 547. The jurisdiction of the court in that case depended upon whether the action was for a tort sounding in damages, or for damages arising from the breach of a contract. It was held to be the former, and the judge, in his opinion, states that—

"The fact that the steam-boat was at the time of the loss engaged in towing the canal-boat under a contract of towage, either express or implied, does not make the negligent and careless navigation of the steam-boat in performing such towage any the less a tort towards the canal-boat, or her cargo, if injured thereby, than it would have been towards a third and stranger vessel which should have been injured thereby. Nor does the fact that such negligent navigation may be a breach of the contract of towage make it any the less a tort towards the canal-boat or her cargo if injured thereby. This view is sustainable entirely aside from any of the doctrines upon which the cases in regard to pure contracts are placed. In cases of contracts of affreightment, and contracts for supplies, the obligation of the delinquent rests wholly upon the contract, and arises wholly out of it. In the present case, the obligation of the steam-boat not to commit a tort against the canal-boat did not arise out of the contract of towage, any more than the obligation of a third vessel, meeting the canal-boat on her trip, not to collide with her, arose out of such contract, or out of any contract. The obligation of the steam-boat not to commit such tort arose out of the principle applicab.. in all cases of tort, *sic utere tuo ut alienum lædas non.* Her duty did not result from the consideration paid, or to be paid, for the towage. It was imposed by the law, and would have existed even though her service had been gratuitous."

Two years afterwards a similar question arose before the same judge in *The Deer,* 4 Ben. 355, and he reaffirms the doctrine held in the case of *The Brooklyn,* saying:

"If the steam-boat was negligent in her navigation in towing the barge, whether she was towing under a contract of towage or not, she was as much guilty of a tort, if the barge was injured through such negligence, as she would have been towards a third and strange vessel, which should have been injured through such negligence. Her duty not to be guilty of such negligence was imposed by the law, and existed even though the service of towing was gratuitous. The barge being lawfully where she was, the steam-boat owed a duty towards her, independent of any contract of towage, and is liable for any damages to her caused by negligent navigation, to the same extent that the steam-boat would be liable for such negligent navigation to a vessel which she was not towing."

To the like effect is the *dictum* of the same judge in the recent case of *The Frank G. Fowler*, 17 FED. REP. 655, and which has been strangely quoted by the proctors of the contesting libelants to support the doctrine that damages for negligence in towing are *ex contractu* and not *ex delicto*. The case was before the circuit court on appeal, and the only question was whether the district court had erred in holding that a subsequent claim for damages arising from negligent towage was entitled to priority of payment over an older claim of the same nature and character. The circuit court reversed the district court, and decided that the earlier claim should be first paid. In the course of his opinion the circuit judge repudiated the notion that claims of this sort arose out of the contract for towage, and said that he could not consider them other than claims sounding in damages for a tort.

The case of *The Liberty No. 4*, 7 FED. REP. 226, in the Southern district of Ohio, was this: The owners of the steam-tug Liberty entered into a contract to tow the barge Speed, with a cargo of salt, from Pomeroy, Ohio, to the port of Cincinnati. The cargo had been insured by the libelants, and upon its total loss on the Ohio river, while proceeding on the voyage, they paid to the owner the amount of the insurance, and filed a libel against the Liberty for damages sustained from negligent and careless towing. On exceptions to the libel for not stating facts sufficient to constitute a cause of action, Judge Swing overruled the exceptions, holding that such an action by the insurance companies to recover for the loss occasioned by negligence was not an action upon a contract. He says, (page 228:)

"If this is an action brought upon a contract, then, as between the libelants and the steam-boat Liberty No. 4, there is no privity in law. Is the libel, however, sounding in contract or is it in tort? The libel sets out the contracts, but that is more as a history of the matter than as a foundation for the action. I think the libel is one against the defendant, not for the violation of a contract which it had entered into, but it is a libel for the wrongful and negligent acts of the defendant in failing to carry out what it was bound to when it undertook to tow the barge to Cincinnati."

The same question was before the supreme court in the case of *The Quickstep*, 9 Wall. 665, on an appeal from the circuit court of the United States for the Southern district of New York. The libel alleged a contract with the steam-tug Quickstep to tow the canal-boat Citizen from New York to New Brunswick, New Jersey, for a stipulated price,

and negligence in the towing, whereby an injury was done to the canal-boat and her cargo; and it claimed damages for the loss sustained. Mr. Justice DAVIS, speaking for the court, in the course of his opinion said:

"The libel was not filed to recover damages for a breach of a contract, as is contended, but to obtain compensation for the commission of a tort. It is true, it asserts a contract of towage, but this done by way of inducement to the real grievance complained of, which is the wrong suffered by the libelant in the destruction of his boat by the carelessness and mismanagement of the captain of the Quickstep."

The claims, then, being *ex delicto* and not *ex contractu*, they have a higher rank, and should be paid before the claims for repairs and supplies. I think this is a settled doctrine in the American as well as the English admiralty, notwithstanding some recent attempts to call it in question. In Abb. Shipp. 533, (10th Eng. Ed.,) it is said:

"The maritime lien of damages, originating in the wrong of the master and crew of the vessel in fault, and founded on considerations of public policy for the prevention of careless navigation, takes precedence * * * of liens *ex contractu*. It absorbs, in the event of the *res* proving insufficient to meet all demands, the liens of wages, towage, pilotage, and bottomry, leaving them to be enforced by proceedings against the person of the owners."

And such, I understand, is the opinion of the supreme court in *Norwich Co.* v. *Wright*, 13 Wall. 122, where, speaking of claims for damages, it is said that "liens for reparation for wrong done are superior to any prior liens for money borrowed, wages, pilotage," etc.

A decree must be entered for the payment of these damages in full, and costs.

The remaining claims are for supplies and repairs, and as these all stand in the same grade, though lower than the claims for salvage and for a tort, they are entitled to share *pro rata* the residue of the fund in the registry.