## THE TRADER.

(District Court, E. D. South Carolina. November 23, 1926.)

No. A-895.

1. Statutes ⊜241(1)—Intention of Legislature governs construction of penal as well as other statutes, and construction should not defeat obvious intent of Legislature.

Though penal laws are to be strictly construed, intention of Legislature governs construction of penal as well as other statutes, and they are not to be construed so strictly as to defeat obvious legislative intent, proper course being to adopt that sense of words which harmonizes best with context and promotes in fullest manner the apparent policy and objects of the Legislature.

2. Seamen ⊜27(1)—Statutory double wages for delay in paying seamen's wages held not "penalty," but incident of actual wages, and protected by maritime lien (Rev. St. 1878, § 4529, as amended by Act Dec. 21, 1898, § 4, and Act March 4, 1915, § 3 [Comp. St. § 8320]).

Provision of Rev. St. 1878, § 4529, as amended by Act Dec. 21, 1898, § 4, and Act March 4, 1915, § 3 (Comp. St. § 8320), that double wages shall be recoverable as wages by seamen for delay in paying wages, held not intended to prescribe a "penalty" in legal signification of term, but to compensate seamen for delay as incident to wages, and as such is protected by maritime lien in same manner as actual wages.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Penalty.]

3. Seamen ⊜18—"Sufficient cause" for delay in paying seamen's wages, affecting liability for double wages, held not to require legal defense to wages (Rev. St. 1878, § 4529, as amended by Act Dec. 21, 1898, § 4, and Act March 4, 1915, § 3 [Comp. St. § 8320]).

"Sufficient cause" for delay in paying seamen's wages, preventing liability for double wages attaching within Rev. St. 1878, § 4529, as amended by Act Dec. 21, 1898, § 4, and Act March 4, 1915, § 3 (Comp. St. § 8320), means that even though there is not sufficient legal defense to claim for actual wages, liability for double wages will not arise if owner or master had sufficient cause to withhold wages when demanded beyond time mentioned in statute.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sufficient Cause.]

4. Seamen ⊜18—Seizure of vessel held sufficient cause to relieve insolvent corporate owner from liability for double wages (Rev. St. 1878, § 4529, as amended by Act Dec. 21, 1898, § 4, and Act March 4, 1915, § 3 [Comp. St. § 8320]).

Where vessel, constituting sole asset of insolvent corporation, which was mortgaged and subject to maritime liens beyond its value, was seized under libel on May 6, and seamen, who had demanded wages on May 4, filed libel for wages on May 7, held, that there was "sufficient cause" for failure to pay wages, within Rev. St. 1878, § 4529, as amended by Act Dec. 21, 1898, § 4, and Act March 4, 1915, § 3 (Comp. St. § 8320), from May 7, if not from May 4 or May 6, preventing liability for double wages attaching.

5. Seamen ⊜13—Seamen on libeled vessel held entitled to passage money to port from which they shipped.

Seamen on vessel seized by marshal under libel for maritime lien held entitled to passage money from port of seizure to port from which they had shipped.

**6. Seamen ⬳18—It is seamen's duty to minimize damages on termination of employment, and court will closely scrutinize claims for living expenses.**

It is duty of seamen, whose employment is terminated by seizure of vessel to satisfy maritime lien, to minimize damages as much as possible, and either obtain other employment or return to their homes at earliest practicable moment, and court will scrutinize very closely all claims for living expenses.

**7. Shipping ⬳133—Failure of vessel to call for cargo, in breach of contract, held not to give maritime lien for damages.**

Where owner of vessel contracted to transport cargo at through rate, including rail and water transportation, but vessel failed to call at port for cargo, shipper had no maritime lien for damages, since cargo was never in control, custody, or possession, actual or constructive, of ship or her master.

**8. Shipping ⬳133—To create maritime lien, ship must have entered into performance of carriage contract and have actual or constructive possession of cargo.**

To hold ship liable for maritime lien for breach of carriage contract, ship, as such, must have entered into performance of contract, so as to create reciprocal relation, which is usually established by loading cargo on board ship, or on lighters engaged by ship, or delivery to or possession or control by ship or her master, so as to give at least constructive possession.

In Admiralty. Libel by the Zimmerns Coal Company, Inc., against the steamship Trader, consolidated with other causes, in which the International Salt Company, Inc., and others, intervened. Claim of named intervener rejected, and decree in accordance with opinion.

A. T. Smythe, of Charleston, S. C., for libelant.

Middleton & Middleton, of Charleston, S. C., for the seamen.

Buist & Buist and Miller, Huger, Wilbur & Miller, both of Charleston, S. C., for sundry intervening libelants.

ERNEST F. COCHRAN, District Judge. In this proceeding there are involved two contests. The first contest is between the seamen of the steamship Trader, on the one side, and all of the other claimants, on the other side, over the question of the allowance by the commissioner to the seamen of extra wages, passage money, and living expenses. The other contest is over the claim of the International Salt Company, Inc., between that company, on the one hand, and the seamen and all other claimants, on the other hand; the salt company claiming a maritime lien and the other claimants denying that the salt company's claim constituted a maritime lien. All the claimants (except the seamen) have stipulated that their respective claims shall share ratably, there being no claim of priority as among them.

The commissioner in his report found that the seamen were entitled to a prior lien on the proceeds of the sale of the vessel for their wages, extra wages, passage money, and living expenses. As to the wages, it was conceded that they were entitled to priority, and by a consent order the wages were paid from the proceeds of the sale of the vessel, without prejudice to the rights of the parties as to any other matters. There are numerous exceptions to the commissioner's report, but it will not be necessary to consider them in detail.

The case was argued before me very fully, and elaborate and able briefs have been filed, discussing the questions involved with citations to numerous decisions. I have read the briefs and citations, and given due consideration to all the points presented, but do not deem it necessary to discuss them in detail, or to review the decisions cited.

The first question is whether the seamen are entitled to the extra wages (that is, two days' pay for one, for delay) under the statute, in priority to the claims of the other claimants. The pertinent facts on this issue, and which should be embraced in the final decree, are as follows:

The steamship Trader is an American vessel, engaged in the coastwise trade, and owned by the Coastwise Navigation Company, a New Jersey corporation. The company had owned the vessel for about 10 months prior to these proceedings. The company was managed by a board of directors. All of the directors were stockholders, and were anxious that the company should succeed, and there does not appear to have been any ill feeling among them. In the operation of the vessel some money had been made, but the company had never paid any dividends, but were trying to pay up the vessel's indebtedness. On or about April 10, 1926, the vessel sailed from New Orleans to Miami and Charleston. The company failed to secure certain cargoes that were expected to be obtained. At that time the company was in serious financial straits. There was a mortgage upon the vessel and also large claims for supplies. The company had no other assets except the vessel.

At that time the company appeared to be on the verge of insolvency and bankruptcy. There was only $700 in cash on hand and the vessel. They then owed about $35,000, which was more than the value of their assets. An

effort was made to induce the stockholders to put some money into the corporation, but this effort failed. The directors considered bankruptcy proceedings, or equity proceedings for a receivership, but finally concluded that it was best to leave it to the admiralty court at Charleston to protect the seamen and creditors, as the ship was all the property that the company had. On May 4, 1926, the seamen received notice in regard to this situation, and they then made formal demand on the master for their wages, but the master had no funds to pay them. The amount demanded for each was the amount due up to May 4, less the amounts paid on account.

The maritime lienors, other than the seamen, began to take steps to protect themselves, and the first suit instituted was that of Zimmerns Coal Company, Inc., of Alabama. This company filed its libel on May 6, 1926; monition and attachment was issued and the vessel seized by the marshal on the same date. On the 7th of May, 1926, the seamen filed their libel, and on that date monition and attachment was issued, and the vessel likewise seized by the marshal under that process. On various dates thereafter, from May 11 to June 3, 1926, various other claimants filed their interventions. The libels and interventions amounted (including the double wages claimed by the seamen) in the aggregate to the sum of $26,950.94. No claim or intervention of any kind was filed by the Coastwise Navigation Company, Inc., the owners of the vessel, and default was duly taken May 25, 1926. The vessel was sold on June 4, 1926, to the highest bidder at public auction for $11,600, and the sale was duly confirmed. On May 25, 1926, by the consent order referred to, the seamen were paid their actual wages, which amounted in the aggregate to $2,933.93.

The extra or double wages which are the subject of this controversy are claimed under section 4529 of the Revised Statutes of 1878, as amended by Act Dec. 21, 1898, c. 28, § 4, 30 Stat. 756, and Act March 4, 1915, c. 153, § 3, 38 Stat. 1164 (Comp. Stat. § 8320). That section provides as follows:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens. * * * Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two

17 F.(2d)—40

days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court. * * * *"

[1, 2] It has been urged that these double wages are penalties, and that therefore this statute should receive a strict construction. While penal laws are to be construed strictly, yet the intention of the Legislature must govern in the construction of penal as well as other statutes, and they are not to be construed so strictly as to defeat the obvious intention of the Legislature. The proper course in all these cases is to search out and follow the true intent of the Legislature, and to adopt that sense of the words which harmonizes best with the context and promotes in the fullest manner the apparent policy and objects of the Legislature. U. S. v. Lacher, 134 U. S. 624, 628, 10 S. Ct. 625, 33 L. Ed. 1080.

Even if I should construe this statute to be a penal one, nevertheless the intention of Congress, to my mind, is fairly obvious, and can be gathered from the context and the nature of the subject-matter. But I do not think this is a penal statute in the sense that that term is usually used. In a certain sense, the double wages are penalties, but not in the legal signification of the term. The obvious intent of Congress was to protect the seamen and assure them a prompt settlement, in view of the nature of their employment and the likelihood of their being discharged far from home, and, in the event of a failure to pay, to secure them an adequate compensation for such failure. It is to be observed that the statute expressly says that these so-called penalties shall be "recoverable as wages." They are an incident to and a part of the actual wages, just as much as interest is an incident to and a part of a debt. They are intended as compensation for the delay in the payment, and, inasmuch as they are an incident to and a part of the wages, they will constitute a maritime lien on the vessel, the same as wages.

[3] But these so-called penalties do not attach nor become payable unless failure to pay the actual wages is "without sufficient cause." The question therefore arises whether the circumstances presented here constituted a sufficient cause for the failure to pay the wages when demanded. It has been urged by the learned counsel for the seamen that these words "without sufficient cause" mean "without sufficient legal cause"; but I cannot accept this construction of the statute. The

statute does not mean that the refusal to pay the wages must be based upon an actual legal defense to the wages. If there were an actual legal defense to the wages, so that they would not be recoverable, the words "without sufficient cause" would be superfluous. The statute means something different from this. It means, as I view it, that although it should turn out that there is no actual legal defense to the wages themselves, and that they ought to be paid, nevertheless the double wages would not attach, if the owner or master had sufficient cause to withhold the wages when demanded beyond the time mentioned in the statute.

[4] The counsel for the seamen also argues that in any event there exists in this case nothing more than financial difficulties, and that financial difficulties do not excuse the failure to pay wages, relying mainly on Gerber v. Spencer (C. C. A. 9th) 278 F. 886. In this I am inclined to agree with them, and, if this case presented merely a question of financial difficulties, I should be disposed to allow the double wages. It is the duty of the master or owner to take steps to insure the prompt payment of wages, and, if financial difficulties were allowed to be a sufficient excuse, it would in many cases practically take away from the seamen their rights under the statute.

But the trouble in this case is that it is not a case of mere financial difficulties. The circumstances go far beyond that. The corporation which owned the vessel was absolutely insolvent. The vessel was mortgaged, and subject to a large number of maritime liens beyond her actual worth. They had no assets except the vessel. Efforts to raise money upon the vessel would have been absolutely fruitless. The only way to raise money was by a contribution of the stockholders. They endeavored to do this, but failed. The stockholders were under no legal liability to pay any further money into the corporation. Indeed, from the facts of the case, no prudent business man could have been expected to put any further money into the venture, which was a hopeless failure. There were no funds to pay these seamen their wages, and all efforts to obtain funds were exhausted. The wages were demanded on May 4.

Under the statute, the master or owner had certainly until the end of May 6 to pay the wages before incurring the so-called penalties; but on May 6 the vessel, which constituted all of the property of the corporation, had been seized by the marshal and was in

the custody of the law, and on the 7th the seamen filed their libel also. The master and owner were then helpless. For all actual purposes, it was the same as if a receivership of all the property of the corporation had been had, or bankruptcy had intervened. Certainly on the 7th of May, when the libel of the seamen was filed, if not on the 6th, there existed a sufficient cause—that is, a reasonable excuse—on the part of the master and owner for failure to pay the actual wages. The law does not compel impossibilities.

Under the facts in this case, there was no earthly way for the owner or master to pay these actual wages unless the master would advance his own personal funds, or some other person would advance the money, when they were under no legal liability to do so, and there was no reasonable hope that any man would do so. I am constrained to hold, therefore, that, in view of all the circumstances surrounding this transaction, certainly from May 7, if not from May 4 or May 6, there was sufficient cause and good grounds for the owner and the master failing to pay the wages. No double wages could accrue under the facts of the case before May 7, and therefore all of the double wages allowed by the commissioner will be disallowed, and the exceptions to the report in that respect sustained.

It has been argued by counsel for the interveners that the rule in admiralty is that no liens can accrue after the seizure of the vessel, and that under that rule the wages cease upon the seizure being made, and that, therefore, no lien for double wages could accrue after such seizure, but they should cease the same as the actual wages. There is much to be said in favor of this view, but I prefer to rest my decision on the ground that, when all the circumstances in the case are considered, they form a reasonable excuse or "sufficient cause," in the language of the statute, for the failure to pay the actual wages.

[5] The next question is in reference to the allowance to the seamen of passage money of $50 each. It appears that the seamen shipped from New Orleans. I think, therefore, that passage money and subsistence en route should be allowed for each seaman, as allowed in the commissioner's report, from Charleston to New Orleans. It appears, however, from the statements of counsel, that the amount of $50 is probably too high, and counsel for the seamen in their brief practically concede that it is a little high, and suggest that they are willing for it to be reduced to $40. The passage money and subsistence

en route, therefore, of each seaman (to whom the same was allowed by the commissioner's report), will be allowed for $40, instead of $50.

[6] The next question is as to the allowance by the commissioner of living expenses. Counsel for the seamen concede that it would be inconsistent to allow double wages under the statute, and also living expenses; but, inasmuch as I have disallowed the double wages, it is proper to consider the question of the allowance of living expenses. In this respect I think the commissioner's report should be sustained. I may say, however, that the time of the allowance of living expenses appears in some cases to be rather a lengthy one. It is the duty of seamen in cases of this sort, where their employment is terminated, to endeavor to minimize the damages as much as possible, and either obtain other employment or return to their homes at the earliest date practicable.

In this case, however, there were peculiar hardships connected with the delay in the payment of the actual wages, and shipping at Charleston is unfortunately rather small, and the court knows that the able counsel for the seamen did everything in their power to arrange for them to obtain other employment or return to their homes as soon as possible. I shall therefore allow the living expenses money for the time set forth in the commissioner's report in this case, but desire to say that hereafter the court expects the seamen to make every effort to minimize the damages, and will scrutinize very closely all claims for living expenses in cases of this sort.

[7, 8] This brings us to a consideration of the claim of the International Salt Company. This question arises upon the exceptions filed to the intervening libel of that company. The pertinent facts on this question are that on or about the 24th of April, 1926, a contract was entered into between the International Salt Company and the Coastwise Navigation Company, the owner of the steamship Trader, for and on behalf of the ship, whereby the Trader was to transport by sea from New Orleans to Savannah, Ga., 500 tons of crushed rock salt in burlap bags at and for a rate of $5.84 per net ton, which rate was inclusive of rail and water transportation, from Avery Island salt mines via New Orleans, from thence on board ship to Savannah, Ga., via Houston, Tex. The salt was transported by rail from Avery Island mines to New Orleans, La., and was there ready for loading on the ship, but the ship failed and neglected to appear at the port of New Orleans, and the salt was not loaded. The salt company made fruitless efforts to obtain transportation from New Orleans to Savannah by another ship, and was compelled finally to transport the salt by rail, and the cost was $1,433 in excess of what would have been the cost of transportation under the contract with the Coastwise Navigation Corporation.

It does not appear where the Avery Island salt mines are situated, nor how far those mines are from New Orleans, nor is the name of the connecting carrier by rail given. There is no allegation that the carrier by rail was in any way associated or connected with or under the control of the Coastwise Navigation Company. No doubt it was simply a separate independent railroad corporation, carrying freight from Avery Island mines to New Orleans.

The claimants who excepted to this claim contend that, although it was a maritime contract, there could exist no maritime lien, because the salt was never delivered to or loaded aboard the ship. The salt company contends that it is entitled to a lien because a through rate was given from Avery Island by the contract.

In order to hold the ship liable for a maritime lien, there must be established a reciprocal relation. The ship is bound to the cargo, and the cargo is bound to the ship; but, in order to establish that relation and give a lien against the ship, the ship, as a ship, must have entered into a performance of the contract, and this is usually established by a loading on board the ship, or a loading on lighters engaged by the ship, or a delivery to or possession or control by the ship or her master, in some way. The Keokuk, 9 Wall. (76 U. S.) 517, 521, 19 L. Ed. 744; Scott et al. v. Chafee (D. C.) 2 F. 401; The Monte A (D. C.) 12 F. 331; The Eugene (D. C.) 83 F. 222; The Saturnus (C. C. A. 2d) 250 F. 407. Petersburg, etc., v. Norfolk, etc. (C. C. A. 4th) 172 F. 321, 24 L. R. A. (N. S.) 569; Bulkley v. Naumkeag, 24 How. 386, 16 L. Ed. 599.

It is true that there need not be an actual physical connection or an actual possession of the cargo in order to bind the ship, and that a constructive possession is sufficient. See Bulkley v. Naumkeag, supra. Petersburg, etc., v. Norfolk, etc., supra. In this latter case the decisions are reviewed at length by the Circuit Court of Appeals of this circuit. In the case at bar there was never any control, custody, or possession, actual or constructive, of the salt by the ship or her master. The mere fact that a through rate was

given by the contract makes no difference. That fact could not give the ship or the master any control, custody or possession of any sort of the salt. The salt company, therefore, has no maritime lien for this claim, and the claim must be rejected.

Inasmuch as the actual wages of the seamen have already been paid under the previous order of this court, the fund now remaining in the registry of the court (after payment of costs) should be applied first to the payment and satisfaction of the living expenses and passage money of the seamen, as allowed herein, or to their proctors, and, if any balance should remain, then to the payment of all of the other claimants (except the International Salt Company) pro rata or to their proctors.

Let a decree be prepared by the proctors for the intervening claimants, embodying the findings of fact as hereinabove set forth, and directing the disbursement of the funds in accordance with this opinion, and a copy of said proposed decree served upon the other proctors in the cause, and the same submitted to the court for signature upon four days' notice.