## THE HERBERT L. RAWDING,

### No. 1012.

District Court, E. D. South Carolina, in Admiralty.

Jan. 29, 1944.

See, also, 55 F.Supp. 165.

Moore & Mouzon, of Charleston, S. C., and Lloyd, Decker, Williams & Knauth, of New York City, for libellant, American Home Products Corporation and other Cargo Claimants.

Augustine T. Smythe, of Charleston, S. C., for libellants, A. K. Bertun, Master, and others.

Barnwell & Whaley, of Charleston, S. C., for libellant, Commercial Terminal & Warehouse.

Hagood, Rivers & Young, of Charleston, S. C., for Bankers Commercial Corporation.

Mitchell & Horlbeck, of Charleston, S. C., for various Cargo Claimants.

Buist & Buist, of Charleston, S. C., for Intercontinental Steamship Lines, Inc.

WARING, District Judge.

The "Herbert L. Rawding" is a four masted wooden schooner rigged sailing vessel of approximately 201 feet in length and 38½ foot beam and having a gross tonnage of 1,219. Her certificate of registry shows her owner as being Intercontinental Steamship Lines, Inc., of New York City.

The schooner laden with certain cargo arrived in the port of Norfolk, Virginia, and while there underwent extensive repairs. On June 24, 1943, Charles A. K. Bertun took command of the ship as master, and on July 19th the vessel left Nor-

folk bound for Cape Town, South Africa. The vessel was fully loaded with a cargo of various classes of merchandise. It appears that shortly after embarking on this cruise the master discovered that the vessel was leaking some where between twenty to thirty-one inches a day although no bad weather had been encountered. On inspection the master discovered that the ship was not in good condition, the standing rigging and some of the spars and masts being in bad shape. A message was sent to the owner through the naval patrol system and two days after the message was sent a United States Coast Guard cutter came alongside the schooner, the master being told to come into Charleston harbor and the cutter towed the vessel in where it was anchored in that part of Charleston harbor known as "Rebellion Roads". The schooner remained anchored there from August 10th to August 25th, on which latter date the master had the schooner towed in and docked alongside of the wharf owned and operated by Frederick Richards and Frederick Richards, Jr., copartners doing business as Commercial Terminal and Warehouse Company. The master contracted with Richards for payment of a wharfage of $12 per day. Nothing further was done in regard to repairs to the vessel or preparation to continue the voyage and on September 10th, American Home Products Corporation, an owner of a portion of the cargo, filed its libel in rem. On September 16th, the master and various members of the crew and others filed a libel claiming preferred maritime liens for wages, services and advancements and supplies. Subsequently a number of other libels were filed by various cargo owners. And Bankers Commercial Corporation filed a libel alleging that it was the owner and holder of two preferred mortgages given under the Ship Mortgage Act, 46 U.S.C.A. § 911 et seq. It was claimed that there was due an unpaid balance of $123,492.38. Certain of the cargo owners amended their libels to set up claims arising from torts.

The master and a number of the crew remained aboard the vessel caring for her as she lay in the dock until they were discharged by the United States Marshal on October 28, 1943. It appears that the Marshal engaged a watchman to be upon the wharf and see that the ship was not taken away, but that the usual caretakers' duties were performed by the master and crew. These, while not numerous, were important since the lines had to be slackened and shortened according to tides and weather, and particularly on account of the fact that the vessel leaked: and she continued to take in water so that the pumps operated by a donkey engine had to be used from time to time. All parties interested in the cause, as well as the United States Marshal, were aware of the fact that the crew was remaining aboard and rendering these services. However, on October 28th, the Marshal's attention having been called to the fact that some question was raised as to the propriety of the crew performing these services, he informed the master and crew that they were no longer needed and placed caretakers aboard the vessel with directions to perform the necessary services for its protection.

The owner of the vessel has filed a claim. Subsequently another libel has been filed by the United States of America claiming compensation for salvage. This last named is based upon services rendered prior to the vessel reaching Norfolk.

Considerable time having elapsed since the first libel was filed, it was realized that this litigation might be considerably protracted in view of the fact that there are many conflicting claims among the various owners of the cargo, the holder of the mortgages, the master and crew, various parties with claims for wharfage, services and supplies, and the government's claim for salvage. There is also a claim by the owner based upon general average. The taking of testimony and hearing of these various matters would and will take some time and it was deemed expedient to order an early sale of the vessel in order to stop the running of costs for caring for the vessel and in order to raise funds to meet these costs as well as the early and pressing claims, especially those of wages for the crew. It was admitted by all parties in interest that a certain amount of wages was due and according to the law and custom in admiralty the pay and care of seamen require prompt attention by the Admiralty Court. Accordingly a decree was entered directing the sale of the ship. After due advertisement the sale was had and the vessel brought the sum of $15,000, which amount has been paid into the registry of the court and the sale has been confirmed and title passed and delivery of the vessel made to its new owner. All claims and questions were relegated to the fund held in the court. Unfortunately, the sale could not be had as quickly as might have

been hoped because of the fact that the vessel was heavily laden with various kinds of cargo and all of this had to be removed and stored before the ship would be available for inspection by prospective purchasers. However, in due course all of this was taken care of. In the meantime and in order to minimize as much as possible the delay in taking care of the preferred claims, the matter was referred to Huger Sinkler, Esquire, a member of the Charleston bar, as Commissioner, with directions to take testimony and pass upon the validity of the mortgages and upon the claims of the master, crew and other parties claiming priority over the mortgage indebtedness by reason of advancements and supplies and services and wharfage. The amounts and priorities of the other matters in issue were relegated to future hearings.

The Commissioner took a great deal of testimony and has filed his report in this court, together with testimony and exhibits. Certain exceptions have been filed to that report, which are now before me, and this opinion is limited to the issues passed upon by the Commissioner. The Commissioner has filed an excellent report fully covering the factual and legal situation and has made his findings and recommendations, dividing the questions in issue before him into eleven sections, some of which, however, he treated together, and the Commissioner's arrangement of these was so well and conveniently made that I shall follow them in commenting on his report.

### 1. Preferred Mortgages

Bankers Commercial Corporation has satisfactorily proven that it is the owner and holder of two mortgages recorded respectively, on October 24th and December 4th, 1942, both of which are preferred mortgages under the terms of the Ship Mortgage Act, 46 U.S.C.A. § 911 et seq., and the mortgage debt is undoubtedly entitled to the preference allowed under that statute. The actual amount due on this mortgage indebtedness was not proved before the Commissioner, but all parties concerned admitted it is far in excess of the amount in the registry of the court and that it will take whatever amount remains after the payment of such claims as may be found to have priority over the mortgages. Under this Act the mortgages in this cause have priority over all claims excepting those which are classed as "preferred mari-

time lien[s]." 46 U.S.C.A. § 953, defines preferred maritime liens as follows: "* * *, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage."

There is no difficulty in this case as to the claims for wages of the crew prior to the time of filing libels, or of the claim of Richards during the period when the ship was in the custody of the Marshal and kept by him at the wharf for unloading the cargo and under order of court. Serious questions are raised, however, as to the other claims herein.

### 2. Wages of Master

The master claims a maritime lien for his wages. It has been repeatedly held that the master is not a member of the crew and has no maritime lien. Over a hundred years ago the Supreme Court speaking through Mr. Justice Story said: "By the maritime law, the master has no lien on the ship, even for maritime wages." The Steamboat Orleans, 11 Pet. 175, 184, 9 L.Ed. 677. This doctrine has been stated and repeated in numerous decisions: The Grand Turk, Fed.Cas.No.5,683 (opinion by Mr. Justice Livingston sitting as Circuit Justice); Willard v. Dorr, Fed.Cas.No. 17,679 (opinion by Mr. Justice Story sitting as Circuit Justice); Drinkwater v. The Spartan, Fed.Cas.No.4,085; The Vandercook, D.C., 24 F. 472; Alabama Dry Dock & Shipbuilding Co. v. Foster, 5 Cir., 31 F.2d 394; Burdine v. Walden, 5 Cir., 91 F.2d 321.

A contention was made on behalf of the master that the foregoing rule does not apply to him in this case since he remained aboard the vessel as a caretaker rather than as master and he is entitled to compensation upon a basis of quantum meruit. This tenuous theory is attempted to be supported by citing the case of The Herdis, D.C., 22 F.2d 304. In that case a man who was formerly master of the vessel and subsequent to his service as such, acted as a caretaker of the vessel was allowed pay. The case is entirely different from

the one at bar. The master here distinctly testified that he continued as master and that his status never changed. It may seem hard that when he stayed by his ship he should not be paid, but under the law the master is the representative of the owner and he is not in a position to claim a lien upon the very property which he is holding in a representative capacity. The master's claim must be denied in toto.

### 3. Wharfage

The next claim considered by the Commissioner is that of Frederick Richards and Frederick Richards, Jr., copartners doing business as Commercial Terminal and Warehouse Company, hereinafter referred to as "Richards". It appears that the vessel was put in the dock alongside of, and was tied up to, a wharf, which was in the possession of and operated by Richards, on August 25, 1943, and claim is for wharfage and a small item of $14 for water furnished. The Commissioner finds that Richards is entitled to a lien having preference over the preferred mortgages from the time that the vessel was libelled on September 10, 1943, at the rate as charged, namely, $12 per day, but disallows the item for water and the claim for wharfage prior to September 10th. Richards has not filed any exceptions to the disallowance and I agree with the Commissioner and affirm his findings.

The proctors representing the mortgagee have excepted to the amount allowed to Richards as a preferred claim. They argue that it was unnecessary to have the vessel moored to a wharf when it would have been more economical to have anchored in the stream and that the contract made by the captain had no effect; that there was no order of court or authority to keep the vessel in that position; and that the charges were excessive; and that the fund should not be thus burdened.

The matter of wharfage service rendered to an arrested ship and how the same should be treated was discussed in 1927 by the Supreme Court in the case of New York Dock Company v. Steamship Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L. Ed. 955. The court speaking through Mr. Justice (now Chief Justice) Stone, says at pages 120 and 121 of 274 U.S., at page 484 of 47 S.Ct., 71 L.Ed. 955:

"A question much argued, both here and below, was whether the case could be considered an exception to the general rule that there can be no maritime lien for services furnished a vessel while in custodia legis. Cf. The Young America, D.C., 30 F. 789; The Nisseqogue, D.C., 280 F. 174; Paxson v. Cunningham, 1 Cir., 63 F. 132; The Willamette Valley, 9 Cir., 66 F. 565. But, in the view we take, the case does not turn upon possible exceptions to that rule, as we think petitioner's right of recovery depends, as the District Court ruled, not upon the existence of a maritime lien, but upon principles of general application which should govern whenever a court undertakes the administration of property or a fund brought into its custody for the benefit of suitors.

"The libellants in the consolidated cause were not only concerned as owners in securing delivery of the cargo, but as lienors they were interested in the ship and, as eventually appeared, in the whole of her proceeds. Service rendered to the ship after arrest, in aid of the discharge of cargo, and afterward pending the sale, necessarily inured to their benefit, for it contributed to the creation of the fund now available to them. The most elementary notion of justice would seem to require that services or property furnished upon the authority of the court or its officer, acting within his authority, for the common benefit of those interested in a fund administered by the court, should be paid from the fund as an 'expense of justice.' The Phebe, Fed.Cas.11,065, 1 Ware 354, 359. This is the familiar rule of courts of equity when administering a trust fund or property in the hands of receivers. The rule is extended, in making disposition of the earnings of the property in the hands of the receiver, to require payment of sums due for supplies furnished before the receivership, where their use by the debtor or receiver in the operation of the property has produced the earnings." (Citing numerous cases.)

And further at pages 122 and 123 of 274 U.S., at page 485 of 47 S.Ct., 71 L.Ed. 955, the court says: "It is enough if the court approves the service rendered *or permits it to be rendered,* and it inures to the benefit of the property or funds in its custody." (Emphasis added.)

It is conceded by the protestants that it was necessary for the ship to be docked alongside a wharf during the period when the cargo was unloaded under order of court, that is to say: from November 5, to December 4, when the vessel was moved

from the wharf, but it is disputed that the charge therefor should be allowed from September 10th to November 5th. I agree with the Commissioner that this should be allowed. The claim allowed, therefore, amounts to 85 days and at the rate of $12 per day aggregates $1,020, for which amount I find that Richards has a preferred claim and should be paid from the fund.

### 4. Wages of Crew (Exclusive of the Master)

The courts have always been guardians of the rights of seamen and look with favor on their claims for care and compensation: "Seamen have always been considered as wards of the admiralty. The wages of their perilous service have been by all nations highly favored in the law. It was the great considerations of policy and justice connected with that humble but most useful class of men that induced the English common law courts to leave to the admiralty the undisputed cognizance of suits for seamen's wages and to make those wages a lien upon the last plank of the ship." Benedict on Admiralty, 6th Edition, Volume 4, page 282.

There is no dispute as to the fact that some wages are due the members of the crew and that these are in a preferred class, but there are several issues as to the correct amounts, and such questions will be considered seriatum.

(a) The first question raised is whether the members of the crew are entitled to double wages from the time when the vessel left the mine fields outside of Norfolk harbor until the time the vessel arrived at Charleston harbor. As to the amount of wages and the matter of double wages, we must turn to the Articles under which the members of the crew were shipped and which of course govern the amount to be paid. The Maritime War Emergency Board has defined the meaning of bonus to be paid to personnel employed on vessels which are a part of the American Merchant Marine. Such part of the ship's Articles as are pertinent to this case, together with the Maritime War Emergence Board's decision have been read into the record. From these it appears that in transatlantic voyages members of the crew are entitled to a bonus of 100%, or in other words, double wages. As the Rawding sailed from Norfolk, Virginia, with intention of going to and delivering cargo at Cape Town, South Africa,

it is apparent that it was on a transatlantic voyage and certainly the portion of the voyage from Norfolk to Charleston is a part of a transatlantic voyage. Sound reason and construction make it clear that the so-called bonus is merely an additional wage that is paid because of the extra hazardous journey in transatlantic service, and that is the settled law in the Fourth Judicial Circuit. In the case of Lakos v. Saliaris (The Leonidas), 116 F.2d 440, the Circuit Court of Appeals speaking through Judge Parker at page 442, says: "There can be no question but that the so-called 'war bonus' was additional wages for extra-hazardous service. It was awarded as the result of a demand for increased wages, and was paid for services rendered and for nothing else. To call a portion of such wages a 'war bonus' does not alter its essential character."

(b) The next question as to the amount of wages is whether the crew were entitled to wages subsequent to the time of the filing of the first libel and until the members of the crew were discharged. I agree with the Commissioner that the general rule is that maritime liens end with the libelling and taking over by the court of a vessel and that after the legal seizure of the ship the seamen ordinarily no longer have a maritime lien for their wages. This matter was fully discussed in a case arising in the Fourth Circuit. See Old Point Fish Co. v. Haywood, 109 F.2d 703. The basis of ending this maritime lien is that the voyage has been broken up and, therefore, the crew are no longer needed. A case cited and relied upon in the foregoing opinion is the Nisseqogue, D.C., 280 F. 174, in which the question of breaking a voyage is discussed and where the crew were allowed a lien for wages between the time when the vessel was libelled by parties other than the crew until such time as the crew themselves filed a libel. This seems to be a fair rule. A libel by a cargo owner, furnisher of supplies, or some other person may be filed based upon some claim substantial or unsubstantial and may be of doubtful validity and litigation may result. But that does not necessarily break up the voyage and often times such a libel is filed, a bond put up to secure the vessel and the voyage resumed. Certainly in such a case it would not be said that the crew had lost their right to claim wages and to rely upon their lien therefor. However, when the crew themselves filed a libel undoubtedly

their maritime lien ended. It, therefore, appears that the proper rule to follow in this case is to hold that the lien of wages of the crew continued until they filed their libel, which was September 16, 1943.

■ (c) A more difficult question is met as to whether the crew should be paid wages after September 16th. As above indicated I am of the opinion that their maritime lien ended at that time. However, they claimed that they should have continued to be paid because of the fact that although the vessel was in custodia legis they stayed aboard ship, rendered maritime service tending and caring for the vessel, had not been discharged; and that such services were accepted and acquiesced in by the court and its representatives. It is claimed that such wages should be paid them, not because of the continuance of their maritime lien, but on a basis of quantum meruit. The United States Marshal testified that he made no arrangement with the master and the crew to take care of the vessel, but that he left it in their charge and assumed that they were taking care of it. This of course would include keeping watch; protecting against fire hazards; loosening and tightening lines as frequently as might be necessary because of the rise and fall of the tide and variations of weather and affected somewhat also by the fact that the ship at times took in water; caring for and operating the donkey engine and pumps and looking after such other matters as might be useful or necessary on the part of caretakers. The Commissioner considered this matter quite carefully and determined that the members of the crew should be paid on a quantum meruit basis on the same theory as that announced authorizing the payment of wharfage. See New York Dock Co. v. Steamship Poznan, 274 U.S. 117, 47 S. Ct. 482, 71 L.Ed. 955, heretofore cited and discussed in this opinion. See also Folkes v. Proceeds of General Goethals, 27 F.2d 183, in which the District Court for the Eastern District of New York follows the well-settled rule that the maritime lien has been lost after the seamen had demanded their wages and the Marshal had taken custody of the vessel, but holds that as the men had rendered valuable service to the ship and the Marshal in charge had knowledge of this and allowed it to continue and considered and used them as keepers and protectors of the property, and no one protested against their rendering this service, that it was reasonable that the men should be compensated for their services. I fully agree with this view and the only question is as to what was the reasonable value of these services and in the absence of an express contract whether they might be measured by the wages that they had heretofore been getting provided the amount of same was not grossly out of line with what similar caretakers' compensation would have been.

The Commissioner discussed the matter of the rate of pay and compares the pay of the watchmen and caretakers employed by the Marshal after the crew had been discharged with the amount of wages claimed by the crew. He finds that if at the time of the filing of the libel by the crew the Marshal had discharged them and hired the same caretakers whom he afterwards engaged that the cost of attending the ship during the disputed period would have amounted to $903, whereas the amount here claimed by the members of the crew during the period they were so engaged aggregates something less than $1100. The difference is not great and there is nothing to show that the Marshal could have obtained the services of the caretakers whom he afterwards used, immediately, or at the rates at which they were engaged. It appears to me that it was a matter within his discretion as to whether he should use crew members or others for this service. While apparently he did not make any special contract with them he allowed them to continue on and the rates of pay are so nearly the same that I do not think there was an abuse of discretion by the Marshal in letting these men stay on at their wage rate or in their expecting to be paid on the same scale of wages which they had been heretofore receiving. I, therefore, feel that the members of the crew were entitled to pay on a quantum meruit basis for the period from September 16th to October 28th, or such portion of that time as the individual members remained aboard and in service and that the rate of pay claimed by them, namely: the same as the wages they had heretofore been earning, was not an unreasonable rate and that the award made by the Commissioner should be and is sustained.

(d) The proctor for the crew excepted to the Commissioner's report and claims that the members of the crew should be paid double wages as a penalty under 46 U.S.C.A. § 596, which is as follows: "The master or owner of any vessel making coasting voyages shall pay to every seaman

his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage."

 I do not think, however, that this applies in the instant case. The penalty imposed by this statute is intended to apply where the delay in payment of the wages was wilful or unreasonable.

"The statute thus confers no right to recover double wages where the delay in payment of wages due was not in some sense arbitrary, willful, or unreasonable." Mc-Crea v. United States, 294 U.S. 23, 30, 55 S.Ct. 291, 294, 79 L.Ed. 735. See also Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696. In the instant case there has been a total failure to show any arbitrary or unreasonable delay in paying wages and in fact, there was no evidence of any demand for the wages having been made until the libel was filed. There were no funds from which to pay the seamen; the vessel had been ordered into this port; she was in bad condition; claims were being made and libels filed by various parties; and the failure to pay wages was clearly through inability and not through wilfulness. I refuse to allow the imposition of this penalty.

### 5. Passage Money for Crew

 The Commissioner has made an award to each member of the crew for cost of transportation or passage money back to the port from which he shipped. He bases his decision mainly upon the case of The Trader, D.C., 17 F.2d 623, opinion by Honorable Ernest F. Cochran, formerly District Judge for the Eastern District of South Carolina.

Title 46 U.S.C.A. § 593, provides that: "In cases where the service of any seaman terminates before the period contemplated in the agreement, by reason of the loss or wreck of the vessel * * *. Such seaman shall be considered as a destitute seaman and shall be treated and transported to port of shipment as provided in sections 678, 679, and 681."

But it will be noted that this section refers to the *loss or wreck* of the vessel, and Sections 678, 679 and 681, are all provisos relative to the government taking care of destitute seamen. The only other statute on which the payment of passage money might be based is the following Section, namely, No. 594, which provides where any seaman is discharged, and proving that he was improperly discharged, he may recover additional compensation. But in this case there is no evidence of improper discharge and the vessel was not a loss or wreck and there does not seem to be any reason for the allowance of passage money under the statutory provisions. See The Nisseqogue, D.C., 280 F. 174.

A reading of the case relied upon by the Commissioner, namely, The Trader, supra, would seem to sustain the claim for passage money. However, in the opinion as filed, Judge Cochran does not discuss in any detail or give reasons for his ordering passage money to be paid, but merely discusses the amount of same. And an examination of the *record* in this case in the District Court discloses that it is not at all an authority for the payment of passage money. The Trader was libelled by a number of parties and the causes consolidated. By an interlocutory order filed May 25, 1926, Judge Cochran decreed: "That the several libellants herein recover of and from the steamship Trader the damages by them sustained by reason of the matters in the several libels alleged."

In the same decree the case was referred to a Commissioner to ascertain the *amounts* of libellants' damages and the priorities of same. In the libels filed by the seamen, claims were made that they were improperly discharged and that they were entitled to wages and damages, including passage money home.

On June 9, 1926, the Commissioner filed his report. In that report the Commission-

er recommends the payment of certain passage money. He finds:

"I further find, that all of the libellants, with the exception of S. Fartus, P. Joneses, W. Lundgreen and E. Crawford, signed for a voyage at New Orleans, to Charleston, S. C., and return, excepting libellant C. Anderson, who signed on at Miami, Florida, for a voyage to Charleston and return to New Orleans. The testimony is to the effect that the passage from Charleston to New Orleans is fifty dollars ($50). The fact of *wrongful discharge is definitely established by the interlocutory decree heretofore entered,* and it is my province to compute merely the amounts due to these libellants, having already determined that their claim is entitled to priority over the others. (Emphasis added.)

"It is a settled doctrine of admiralty law that when a seaman is wrongfully discharged from a vessel he is entitled to his living expenses and passage money back to the vessel's final port of discharge. The Washington, D.C., 296 F. 158; Alaska S. S. Co. v. Gilbert, 9 Cir., 236 F. 715; Jenkins v. United States Emergency Fleet Corp., D.C., 268 F. 870; The William Penn, 1925 A.M.C. 1316; The Superior, D.C., 22 F. 927; The Samuel Little, 2 Cir., 221 F. 308."

These proceedings will be found in the records in the District Court for the Eastern District of South Carolina at Charleston, and are filed as Case No. 897 on the Admiralty Docket in that court.

I, therefore, overrule the allowances for transportation made by the Commissioner and direct that such amounts be excluded from the payments made to the members of the crew.

### 6–11. Various Claims for Services and Supplies

All of these claims are predicated upon alleged preferred maritime liens for services rendered to the vessel while she was in Charleston.

6. Richardson Brothers, Inc., has a charge for services for use of a launch in traveling to and from the vessel while she lay at anchor in Rebellion Roads.

7. Marine Contracting & Towing Company has a charge for towing and docking the schooner.

8. Robert L. Grissom has filed a claim for services and disbursements made by him.

9. T. Keith Marshall has a claim based upon services as an accountant in auditing the ship's records.

10. Harriott Pinckney Home for Seamen has a charge for meals furnished members of the crew.

11. Ingvar E. Villadsen, who was a member of the crew, has a charge for moneys advanced by him for the purpose of purchasing supplies for the vessel.

All of these claims are for services rendered prior to the filing of all of the various libels and before the ship was taken in charge by the court. None of them are preferred maritime liens as set out in 46 U.S.C.A. § 953. The various claimants may have maritime liens, but not being preferred as defined by the statute they rank subsequent to the mortgages and are, therefore, not entitled to priority of payment over the mortgage indebtedness. As has been already pointed out, the fund arising from the sale of the vessel is not even sufficient to pay the mortgage indebtedness and it is therefore, unnecessary to attempt to fix the amounts that may be due under these various claims since there are not sufficient funds to pay them unless they are held to be liens having priority of payment over the mortgage indebtedness. They are not such liens and, therefore, I can not give them any relief and they have no remedy unless the ship's owner is responsible and suit in personam be brought against it.

In view of the fact that there may be appeals from some of the allowances hereinbefore made, it will be appropriate at this time to enter a decree providing for the payment of such portions of these awards as are not contested and the withholding of payment of the contested portions until such time as such appeals have been decided, or the time for appeals has expired, or appropriate stipulations have been filed waiving appeals.

The proctors for the seamen and for Richards will prepare and present proposed findings of fact and conclusions of law in accordance with the foregoing opinion, together with a proposed decree, as provided by 28 U.S.C.A. § 771 and Rule 46½ of the General Admiralty Rules, 28 U.S.C.A. following section 723; the same to be presented on five days' notice, with service of a copy of same on the opposing proctors.

The cause will of course be kept open for the disposition of other issues not hereinabove passed upon.