## THE GRAF KLOT TRAUTVETTER.

### (*District Court, D. South Carolina.* February 3, 1881.)

1. LIENS—MASTER—SEAMEN—MATERIAL-MEN—ESTOPPEL.

> Where libels were filed by material-men against a foreign vessel that had been repaired in a port of this country, the claims of the different libellants adjudicated on, and the vessel sold to satisfy the same, *held*, on a petition of intervention, presented by the master and seamen, for the purpose of establishing the priority of their respective liens, that the maritime law of this country must govern, and that, under it, the master has no lien on the vessel, as against material-men, for wages or advances. *Held, also,* that he is estopped from setting up such a claim as would defeat, to that extent, the claims of material-men, where he represented himself to be a part owner when he obtained from them the credit which they gave him. *Held, further,* that wages of seamen and their claims for passage money are entitled to priority over the liens of material-men.

In Admiralty. Petition to establish liens.

SEABROOK, Commissioner. In pursuance of a decretal order in the above-entitled cause on the thirtieth of November, 1880, by which it was referred to the undersigned, one of the commissioners of this court, "to ascertain the respective amounts due to the petitioners and the priorities of their respective liens on said barkentine, and to report the same, with leave to report any special matter," to this court, I, E. M. Seabrook, the commissioner to whom the matter was referred, do report that I was attended by C. Inglesby, Esq., of Messrs. Lord & Inglesby, proctors for the intervening libellants, the petitioners in this cause, and by Isaac Hayne, Esq., of Messrs. Hayne & Ficken, I. P. K. Bryan, Esq., of Messrs. Bryan & Bryan, I. N. Nathans, Esq., and James P. Lesesne, Esq., of Messrs. Lesesne & Lesesne, proctors for the different original libellants against the barkentine Graf Klot Trautvetter, and have taken and examined the testimony offered in support of the claims of the said intervening libellants, and as to the priorities of the same, and beg to submit the following

REPORT:

It is proper, in the first place, to state that libels were filed against the barkentine Graf Klot Trautvetter in this honorable court on the sixth, eighth, and sixteenth days of November last, and that the claims of said libellants were adjudicated by it, and said vessel sold by its decree of November 20, 1880, to satisfy the same.

The claims of the intervening libellants are reported upon in the order in which they are set forth in their petitions.

1. The claim of H. W. Frundt, master of the barkentine Graf Klot Trautvetter. This claim is as follows:

| | | |
|---|---:|---:|
| 21 months' and 15 days' wages, as master, from 17th February, 1879, to December 2, 1880, at 120 marks per month, | marks 2,580 | |
| 5 per cent. commission on £1,498 freight, | 1,517 | |
| Passage money to Antwerp, | 300 | |
| Marks, reduced to U. S. currency, | marks 4,397 = | $1,054 71 |
| Expenses on shore in Charleston while bark was repairing, | | 150 00 |
| Amount advanced for vessel, | | 48 00 |
| | | $1,252 71 |

This claim of the master is based upon the assumption that the Graf Klot Trautvetter, being a German vessel, the said claim must be decided by German maritime law, and that according to that law the master of a German vessel has a prior lien on the vessel, equally with the seamen, for his wages. The maritime law of the United States, as administered in its courts of admiralty, on the other hand, while it regards the claims of seamen for wages as a sacred lien, and gives them priority over all other claims on the vessel, does not extend this privilege to the claims of a master of a vessel for wages. It gives the master of a vessel no lien on the vessel for his wages, or for advances and disbursements made by him abroad. The decisions in support of this position are to be found quoted at length in Desty, Ship. & Adm. 117, 118.

As this honorable court, as stated in the beginning of this report, has decreed that the claims of the original libellants in this case were liens upon the vessel, the issue is raised between the aforesaid claims and that of the master of the aforesaid vessel, and this issue involves the question whether the German maritime law or the maritime law of the United States should govern in the decision of the conflicting claims of the respective libellants.

I hold that the maritime law of the United States must govern,

and that the master of said vessel has no lien on the vessel for his wages and advances, as set forth in his petition. In support of this view the following distinguished authority is referred to. Chief Justice Story, in his Conflict of Laws, § 323, pp. 394–95, says:

"But the recognition of the existence and validity of such liens, by foreign countries, is not to be confounded with the giving them a superiority, or priority, over all other liens and rights justly acquired in such foreign countries, under their own laws, merely because the former liens in the countries where they first attached had there by law, or by custom, such a superiority or priority. Such a case would present a very different question arising from a conflict of rights, equally well founded, in the respective countries.

"This very distinction was pointed out by Mr. Chief Justice Marshall in delivering the opinion of the court in an important case. His language was: 'The law of the place where the contract is made is, generally speaking, the law of the contract; i. e., it is the law by which the contract is expounded. But the right of priority forms no part of the contract. It is extrinsic, and rather a personal privilege, dependent on the place where the property lies, and where the court sits which is to decide the cause.' And the doctrine was, on that occasion, expressly applied to the case of a contract made in a foreign country with a person resident abroad."

Section 324: "Huberus has also laid down the qualifying doctrine: foreign contracts are to have their full effect here, provided they do not prejudice the rights of our own country, or its citizens."

"Hence," he adds, that "the general rule should be thus far enlarged, if the law of another country is in conflict with that of our own state, in which also a contract is made, conflicting with a contract made elsewhere, we should in such a case rather observe our own law than the foreign law."

Section 326, p. 410: "Lord Ellenborough has laid down a doctrine essentially agreeing with that of Huberus. 'We always import,' says he, 'together with their persons, the existing relation of foreigners, as between themselves, according to the laws of their own countries; except, indeed, where those laws clash with the rights of our own subjects here, and one or other of the laws must necessarily give way; in which case our own is entitled to the preference. This having been long settled in principle, and laid up among our acknowledged rules of jurisprudence, it is needless to discuss it further.' The supreme court of Louisiana has adopted a little more modified doctrine, coinciding exactly with that of Huberus, 'that in a conflict of laws it must often be a matter of doubt which should prevail, and that whenever that doubt does exist the court which decides will prefer the law of its own country to that of a stranger; and if the positive laws of a state prohibit particular contracts from having effect according to the rules of the country where they are made, the former must prevail.'"

Section 327, pp. 410, 411: "Mr. Chancellor Kent has laid down the same rule in his commentaries, as stated by Huberus and Lord Ellenborough, and said: 'But on this subject of conflicting laws it may generally be observed that there is a stubborn principle of jurisprudence that will often intervene and

act with controlling efficacy. This principle is that where the *lex loci contractus* and the *lex fori,* as to conflicting rights acquired in each, come in direct collision, the comity of nations must yield to the positive law of the land.' Mr. Burge has expressed his own exposition of the doctrine in the following terms: 'The law of a foreign country is admitted in order that the contract may receive the effect which the parties to it intended. No state, however, is bound to admit a foreign law, even for this purpose, when that law would contravene its own positive laws, institutions, or policy, which prohibit such a contract, or *when it would prejudice* the rights of its own subjects.' "

We are not left, however, to rely upon the authority of the distinguished text writer above quoted in the solution of the question at issue, as it has been directly adjudicated in our own courts. In the case of *The Bark Selah,* in the district court of the United States for the district of California, Judge Hoffman rendered the following decision:

" The master of the above bark, which is a British vessel, intervenes for the payment of his wages out of the proceeds, concurrently with the seamen; and in preference to the claims of certain material-men for supplies furnished in this port on the usual credit of the ship-owners and masters. He claims this right under the Statute of 17 & 18 Vict. *c.* 104, § 191, which provides that every master of a ship shall, so far as the case permits, have the same rights, liens, and remedies for the recovery of which, by this act, or by any law or custom, any seaman not being master has for the recovery of his wages.

" No decision is produced under this act to the effect that the master may assert his claim for wages in priority to those of material-men with whom he has contracted and to whom he is personally liable.

" But, even if such be the law of England, it cannot supersede our own laws, which determine the rights of persons within our jurisdiction, and the effects of contracts made under them. As the contract with the material-man was made in this port, its effect, and the remedies under it, must depend upon our law, which is at once the *lex fori* and the *lex loci contractus.*

" By the general maritime law prevailing in the United States and administered by the national courts of admiralty, the claim of the material-man for materials furnished to a foreign vessel carries with it a lien on the vessel and has a priority over the master's claim for wages.

" It was held by Mr. Justice Story that even the states of this Union have no power to alter, enlarge, or narrow, with respect to foreign vessels, the admiralty jurisdiction of the United States, as governed by the legislation of congress, and by the general principles of maritime law. They have no authority to change that law, in respect to such vessels, by denying liens existing under it, by creating new liens not recognized, or alter the priorities among different lienholders. *The Chusan,* 2 Story, 463.

" If such powers are withheld from the states they surely cannot be conceded to the legislature of a foreign country. By the maritime law which it is the duty of this court to administer, the libellant is entitled to a lien on the

vessel. unless it clearly appears that he gave an exclusively personal credit to the master or owners, in exoneration of the vessel. *The Nestor*, 1 Sumn. 73, 75.

"The proof in this case is insufficient to establish that state of facts. Nor does it appear that an exclusive credit was given to the ship and owners, in exoneration of the master's liability.

"As the claim, therefore, is one to which the maritime law attaches a lien prior to that of the master of any existing under that law, and as the master is himself personally liable for the debt, his claim must be postponed to that of the libellant. 4 Sawy. 40, 41."

But even if it should be admitted that the German law is the law of this case, I hold that the claim of the master cannot be maintained. The evidence before me shows that the master, when obtaining the credit which he did from the material men, represented himself absolutely as part owner of the vessel, and rendered himself liable for said indebtedness, and he is estopped from setting up a claim which, if allowed, would, *pro tanto*, defeat the claim of the said material-men.

2. Claim of Carl Saatman, mate, shipped at Liverpool September 5, 1879, discharged December 2, 1880, at Charleston, South Carolina.

This claim is as follows, to-wit:

14 months and 27 days' wages, at 78 marks per month,
from 5th September, 1879, to December 2, 1880, - marks 1,162
2½ months' wages, to pay passage home, - 195

marks 1,357
Less amount paid him by captain, - - 239

marks 1,118 = $268 11

In considering this claim, the first question raised is as to the item of 195 marks, for 2½ months' wages, to pay passage home, the solution of which depends upon the German law. So far as I have been able to learn, the German law applicable to the point in issue, from the translations of the same put in evidence, is as follows, to-wit:

"When the contract for wages is terminated before the completion of the voyage, without any fault of the crew, (as in this case, by the sale of the vessel under process of law,) and the crew are discharged, they are entitled to the wages earned up to the date of the termination of the contract, and in addition to a free passage to the port from which they shipped, and to the wages which they would have earned during said passage, or to a corresponding remuneration, according to the option of the captain,—the return passage, and wages together, to be computed at from two and one half to four months'

wages, according as the crew is discharged in a European or foreign port; but they are not entitled to more than they would have earned on the completion of the voyage."

It further provides that the claim to a return passage and wages is satisfied if the seaman is capable of work and gets service on a German ship, corresponding to his former position and wages, and the ship is bound to the port from which he shipped, or to some port lying near the same. In this latter case free passage and wages are allowed from the port to which he is bound to the port from which he shipped.

The German law upon this point is similar to the English and American laws, and is for the protection of seamen. It is intended, where there is a breach of contract for wages without fault of the seaman, to secure to him indemnity; or, in other words, to place him in as good a position as he would have been in had the contract been performed. In this case no port for the termination of the voyage was fixed in the shipping articles; the contract was for certain ports, and further on.

The evidence shows that the Trautvetter was purchased by a German, a resident of Barth, Germany, and that on the seventh of December she was engaged under a charter-party "for a voyage from Charleston, South Carolina, direct to a safe port in the United Kingdom or on the continent—Havre to Hamburg, both included, or so near thereto as she can safely get—on terms following; port of discharge to be named on signing bills of lading," and that Carl Saatman shipped on said vessel as mate. The evidence does not show at what wages he shipped, but, in the absence of proof to the contrary, the inference is that the wages for which he shipped under the charter-party were equal to those he had been receiving, and that he would be placed, at the termination of the voyage, in as good a position as if the original contract had not been terminated. I report the following amount to be due him:

15 months' and 3 days' wages, at 78 marks per month,
   from September 5, 1879, to December 8, 1880,   -   marks 1,178
Less amount paid him by captain,   -   -   239

                                marks   939 = $225 36

It was contended that the amount of 78 marks, the advance stipulated in the shipping articles to be paid to the mate, should be deducted from his claim. I hold that it was competent to prove by

parol testimony that said advance was not paid, and that the evidence adduced proves its non-payment.

Claim of John Schacht, carpenter. Shipped February 28, 1879, at Antwerp; discharged November 9, 1880, at Charleston, South Carolina. This claim is as follows:

20 months' and 12 days' wages, at 54 marks per
  month, from 28th February, 1879, to 9th No-
  vember, 1880, - - - - - marks 1,099 93
2⅓ months' wages, to pay passage home, - 135 00

                                      marks 1,234 93
Less amount paid him by captain, - - - 197 46

                                      marks 1,037 47 = $248 79

Claim of August Lass, seaman. Shipped at Antwerp on twenty-eighth of February, 1879; discharged at Charleston, South Carolina, November 9, 1880. This claim is as follows:

16 months' wages, at 36 marks, from 28th February,
  1879, to June 20, 1880, - - - - marks 576 00
4 months and 12 days as steward, at 48 marks, from
  28th June to 9th November, 1880, - - 211 20

                                      marks 787 20
2⅓ months' wages to pay passage home, - - 120 00

                                      marks 907 20
Less amount paid him by captain, - - 470 29

                                      marks 436 91 = $104 78

Claim of William Muller, seaman. Shipped at Antwerp 28th February, A. D. 1879; discharged at Charleston, South Carolina, November 9, 1880. This claim is as follows:

16 months' wages, at 33 marks per month, from 28th
  February, 1879, to November 9, 1880, - - marks 528 00
4 months and 12 days, at 36 marks per month, from
  28th June to November 9, 1880, - 158 40
2⅓ months' wages, to pay passage home, - - 90 00

                                      marks 776 40
Less amount paid him by captain, - - 311 97

                                      marks 464 43 = $111 37

Claim of John Saatman, seaman. Shipped at Glagow 17th Feb-

ruary, 1878; discharged at Charleston 9th November, 1880. This claim is as follows:

| | | |
|---|---|---|
| 12 months' wages, at 25.50 marks, from 17th February, 1878, to 17th February, 1879, | marks | 360 00 |
| 16 months' wages, at 23 marks, from 17th February, 1879, to 17th January, 1880, | | 368 00 |
| 4 months' and 25 days' wages, at 33 marks, from 17th June, 1880, to November 9, 1880, | | 159 50 |
| 2½ months' wages, to pay home passage, | | 82 50 |
| | marks | 970 00 |
| Less amount paid him by captain, | | 412 86 |
| | marks 557 14 | = $133 61 |

The aforesaid libellants are represented by Capt. Frundt, under a power of attorney. The power of attorney authorizes Capt. Frundt to demand and sue for the wages and compensation due the said libellants for services rendered by them as seamen on board of the barkentine Trautvetter, and purports to have been signed on the twenty-sixth of November, 1880, by the said seamen, in presence of P. Belt, chief officer of the ship Neptune, aboard which ship they had sailed. As P. Belt, the witness to the signatures of the said seamen, sailed with them on the day of the execution of the said power of attorney, it was attempted to prove the same by the testimony of Capt. Frundt. Capt. Frundt testified that he saw the said seamen sign the power of attorney on the morning of the twenty-sixth of November, 1880, in the presence of P. Belt, chief officer of the ship Neptune, in the cabin of the said vessel.

It was contended that the signatures to the power of attorney were not genuine, but were written by the same party, and that the power of attorney was illegal.

Witnesses who had much experience in deciphering handwriting were called upon to testify as to the genuineness of the signatures.

Messrs. E. H. Sparkman and William Thayer testified that in their opinion the signatures to the power of attorney were by the same party, and did not correspond with the signatures to the shipping articles.

Messrs. E. A. Pringle, M. W. Wilson, and J. E. Philips, on the other hand, testified that in their opinion the signatures to the power of attorney were by different parties, and corresponded to the shipping articles.

W. M. Oglivie, a clerk of Capt. Card, testified that he was ac-

quainted with the signature of P. Belt, and that in his opinion the signature to the power of attorney as witness was P. Belt's, although he would not swear to it.

The testimony further shows that the power of attorney in question was prepared by Messrs. Lord & Inglesby, the attorneys of the intervening libellants, upon discovery that the ship Neptune, aboard which the aforesaid seaman had shipped, had not crossed the bar and was still in port; that it was arranged that Mr. Inglesby, of said firm, should accompany Capt. Frundt to the Neptune the next day (which was Sunday) and witness the execution of the power of attorney; that in execution of such arrangement Mr. Inglesby met Capt. Frundt at 10 o'clock A. M., the hour appointed, at Southern wharf, and was prevented from going to the Neptune by a heavy fog; that Mr. Inglesby was unable to go the next day, (Monday,) being compelled to go to Columbia that night, and gave the power of attorney to Capt. Frundt to take to the Neptune and obtain the signatures of the seamen to the same; that the power of attorney was returned to Mr. Inglesby the same day by Capt. Frundt, executed as offered in evidence.

The evidence further shows that the shipping articles of the barkentine Trautvetter were delivered to Mr. Witte, the German consul, on the third day of September, the day after the arrival of the said vessel in the port of Charleston, and remained in his possession until produced in evidence in this cause.

From the evidence before me, I report that the signatures to the power of attorney are genuine.

The evidence further shows that the said seamen voluntarily shipped on the ninth of November, 1880, on board of the ship Neptune, for Bremen, a port nearer to Barth, their home port, than Antwerp, the port from which they originally shipped. It does not show, however, the wages at which they shipped. In the absence of proof to the contrary, the presumption is that the wages they shipped at aboard the Neptune were at least equal to those for which they had contracted aboard the Trautvetter. I report that the said seamen are not entitled to return passage home and wages, as stated in the claim in their petition. Objections were made to the increase of wages set forth in the claims of August Lass, William Muller, and John Saatman, on the ground that provision for the same did not appear in the shipping articles.

The evidence shows that August Lass shipped aboard of the Trautvetter as a seaman, and was promoted to the position of steward

on the twenty-eighth of June, 1880, at New York, to fill the position of the steward who then left the vessel, and that the increase of wages allowed him corresponded with those given to his predecessor. I hold that the said seaman, August Lass, is entitled to the increase of wages allowed him, as stated in his claim: "If a seaman is promoted he takes the wages of his new office." 2 Parsons, Ship. & Adm. 43; *The Providence,* 1 Hagg. Adm. 391; *The Gondolier,* 3 Hagg. Adm. 190; *Hicks* v. *Walker,* Exch. 1856, p. 37, (Eng. L. & Eq. 542;) *The Schooner Wm. Martin,* 1 Spr. 564.

I hold, also, that the captain had a right to increase the wages of the seamen William Muller and John Saatman, and that it is competent to prove the same by parol and documentary testimony, and that the evidence adduced proves the increase of wages, as stated in their claims.

I report that the following amounts are due the said seamen:

### TO JOHN SCHACHT, CARPENTER.

| | | |
|---|---|---|
| 20 months' and 12 days' wages, at 54 marks per month, from February 28, 1879, to November 9, 1880, | marks 1,099 93 | |
| Less amount paid him by captain, | 197 46 | |
| | marks 902 47 = $216 59 | |

### TO AUGUST LASS, SEAMAN.

| | | |
|---|---|---|
| 16 months' wages, at 36 marks, from 28th February, 1879, to June 28, 1880, as seaman, | marks 576 00 | |
| 4 months and 12 days as steward, at 48 marks per month, from 28th June, 1880, to November 9, 1880, | 211 20 | |
| | marks 787 20 | |
| Less amount paid him by captain, | 470 29 | |
| | marks 316 91 = $76 06 | |

### TO WILLIAM MULLER, SEAMAN.

| | | |
|---|---|---|
| 16 months' wages, at 33 marks per month, from 28th February, 1879, to November 9, 1880, | marks 528 00 | |
| 4 months and 12 days, at 36 marks per month, from June 28, 1880, to November 9, 1880, | 158 00 | |
| | marks 686 00 | |
| Less amount paid him by captain, | 311 97 | |
| | marks 375 03 = $90 03 | |

TO JOHN SAATMAN, SEAMAN.

| | | | |
|---|---|---:|---:|
| 12 months' wages, at 25.50 marks, from 17th February, 1878, to 17th February, 1879, | marks | 360 | 00 |
| 16 months' and 25 days' wages, at 33 marks, from 17th February, 1879, to 17th June, 1880, | | 368 | 00 |
| 4 months and 25 days, at 33 marks, from 17th June, 1880, to 9th November, 1880, | | 159 | 50 |
| | marks | 887 | 50 |
| Less amount paid him by captain, | | 412 | 86 |
| | marks | 474 64 = | $113 91 |

Claim of Maximus Lundquist, (Swede,) seaman. Shipped at New York 28th June, 1880; discharged at Charleston, December 2, 1880. Claim is as follows:

| | | |
|---|---:|---:|
| 5 months' and 4 days' wages, at $12 per month, from 28th June, 1880, to December 2, 1880, | $61 | 60 |
| 2½ months' wages, to pay passage home. | 30 | 00 |
| | $91 | 60 |
| Less amount paid him by captain, | 25 | 00 |
| | $66 | 60 |

I report that the evidence shows that the above seaman contracted at $10 per month wages, instead of $12, as stated in above claim. There being no evidence before me showing that the said seaman contracted for a return to New York, I report that he is entitled to a return passage to New York, and wages which he would have earned during said passage, according to the rate of wages contracted for aboard of the Trautvetter. I report the amount due said seaman to be—

| | | |
|---|---:|---:|
| 5 months' and 14 days' wages, at $10 per month, from 28th June, 1880, to 12th December, 1880, | $54 | 66 |
| Return passage money to New York, | 10 | 00 |
| | $64 | 66 |
| Less amount paid him by captain, | 25 | 00 |
| | $39 | 66 |

Claim of Hans Larsen, (Swede,) seaman. Shipped at New York the twenty-eighth of June, 1880, discharged December 2, 1880. Claim is as follows:

5 months' and 4 days' wages, at $15 per month, from 28th June,
1880, to December 2, 1880, - - - - - - - $ 77 00
2½ months' wages to go home, - - - - - 37 50

$114 50
Less amount paid him by captain, - - - - - 36 00

$ 78 50

I report the amount due said seaman to be—

5 months' and 14 days' wages, at $15 per month, from June 28, 1880,
to December 12, 1880, - - - - - - $ 82 00
Passage money to New York, - - - - - 10 00

$ 92 00
Less amount paid him by captain, - - - - - 36 00

$ 56 00

In estimating the aforesaid claims 10 days are ,allowed for the
voyage of a sailing vessel from Charleston to New York, and $10 for
the passage of a sailor.

I report that the claims of the aforesaid seamen, Carl Saatman,
John Schacht, August Lass, John Saatman, William Muller, Maxi-
mus Lundquist, and Hans Larsen, are liens upon the said barkentine
Graf Klot Trautvetter, and are of the same rank as to priority. I
report, further, that the said liens are prior to the claims of the
material-men, which were adjudged liens on said vessel by a decree
of this honorable court, of date the twentieth of November, 1880, as
stated in the first portion of this report.

The evidence taken before me in this case is filed with this report,
and is marked as follows, to-wit:

Testimony of witnesses, Capt. F. W. Frundt, Carl Saatman, Hans Larsen,
Maximus Lundquist, C. O. Witte, E. A. Pringle, M. W. Wilson, J. E. Philips,
and W. M. Oglivie, marked Exhibit A. Power of attorney by seamen to Capt.
Frundt, Exhibit B. Copy of accounts of receipts and expenditures of barkentine
Trautvetter, Exhibit C. Copy of seamen's accounts, Exhibit D. Copy of
ship's certificate, Exhibit E. Charter-party at Montevideo, Exhibit F. Char-
ter-party at Charleston, S. C., Exhibit G. Translation of German law, Ex-
hibits H, 1 and 2, and I. Lithographs of signatures to the shipping articles
of the Trautvetter, Exhibit J.

(This report was subsequently confirmed by the district court.)