THE VIRGO.[1]

DABINOVICH *et al. v.* THE VIRGO. MERRITT WRECKING CO. *v.* SAME. COSCHINA *v.* SAME. CHERTIZZA *et al. v.* SAME. PROVINCIAL DRY-DOCK CO. *v.* SAME. EMPIRE WAREHOUSE CO. *v.* SAME. STEBBINS *v.* PROCEEDS OF SAME. LUCKENBACH *et al. v.* SAME.

*(District Court, E. D. New York. April 9, 1891.)*

MARITIME LIENS—PRIORITY — WAGES — SALVAGE — SUPPLIES — LACHES—BURDEN OF PROOF.

Claims for wages, salvage, and supplies, incurred upon the same voyage, at the port where the salvage service terminated, where the seamen's right of action accrued, and where the supplies were furnished, are concurrent, and the liens for wages and salvage take precedence over the lien of the material-men, where there has been no such laches on the part of the salvors as to deprive them of their right to priority. The burden of showing such laches is on the material-men.

In Admiralty. On application for distribution of the proceeds of the bark Virgo.

*Ullo & Ruebsamen,* for Dabinovich *et al.*
*Hand & Bonney,* for Merritt Wrecking Co.
*Hobbs & Gifford,* for Coschina and Chertizza & Co.
*Edwin G. Davis,* for Dry-Dock Co.
*Fred. W. Hinrichs,* for Warehouse Co.
*Peter S. Carter,* for Stebbins and Luckenbach.

BENEDICT, J. These cases come before the court upon an application for a distribution of the proceeds of the bark Virgo. The facts are not in dispute. The Virgo, an Austrian bark, bound from Buenos Ayres to New York with a cargo of bones, went ashore on Long island on the 15th of November, 1890. She was assisted by the Merritt Wrecking Company, pulled off the beach, and brought to New York in safety, her master and crew remaining on board and in possession. After her arrival in New York negotiations were entered into between the representatives of the vessel, cargo, and freight and the salvors as to the amount of salvage compensation to be paid. Pending these negotiations the ves-

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

sel was towed from Staten island to the Erie basin by a tug employed by the master. At the Erie basin her cargo was discharged, and at the request of the master certain boards required for the purposes of discharging the cargo were supplied by one John Chertizza. His bill amounted to $66.20, and included a few dollars for oakum and planking, and four days' carpenter work furnished the vessel after she was placed upon a dry-dock, to which she was taken when the cargo was discharged. Up to this time it was the understanding of the salvors, as well as the master of the ship, and all concerned, that the vessel was to be repaired, and proceed upon her voyage home. When, however, the vessel was raised upon the dry-dock, it was ascertained that the condition of her bottom was such as to render it inexpedient to repair her. Whereupon she was let off the dry-dock, and the voyage abandoned. She was then libeled for wages by the crew, which had been shipped in Marseilles for the voyage, except two shipped in Buenos Ayres for the term of one year, and had up to that time remained on board, and in the service of the ship. The salvors also libeled the vessel to recover salvage for the service rendered in hauling the vessel off the beach, and then libels were filed by Chertizza & Co. for the boards, etc.; by Frank Coschina for $274.58, for provisions furnished to feed the crew; by A. R. Stebbins for $15, towage; by Ed. Luckenbach for $16, towage; by the Empire Warehouse Company for $171.66 for wharfage; and by the Provincial Dry-Dock Company for $84 for the use of the dry-dock. No owner appeared in any of these proceedings. In the suit of the seamen the vessel was condemned, and she was sold by the marshal for the sum of $2,355. In the suit for the salvage the salvage compensation was fixed by the court at $500. This was for the salvage due by the vessel alone, and did not include salvage due from the cargo or the freight. The amount of wages due the crew up to the time of filing their libel was ascertained to be the sum of $979.31. The amounts due the other libelants above mentioned were ascertained to amount in the whole to the sum of $631.44. The proceeds of the vessel being insufficient to pay these demands and the taxable costs in full, the question of the distribution of the fund in court is presented; the demands being for wages, for salvage, for supplies, and each class insisting upon priority in payment over the other two. Under the circumstances attending the abandonment of the voyage, the rendition of the salvage service, and the incurring of the other debts above mentioned, all these demands must be deemed concurrent. They were incurred upon the same voyage, at the port where the salvage service terminated, where the seamen's right of action accrued, and where the supplies were furnished. The order of their payment out of the proceeds of the ship must therefore be determined by the rules ordinarily applied to demands of this character arising at the same period in the prosecution of a single voyage. By these rules the demands of the salvors and of the seamen take precedence over the demands of material-men.

It is contended that a different rule should be applied here, because the salvors delayed prosecuting their claim for the space of 60 days after

the completion of the salvage service, and permitted the vessel to be subjected meanwhile to the liens of the material-men. The question raised by this contention is not a question of priority, but of laches, and the burden is upon the material-men to show such laches on the part of the salvors as to deprive them of their right to priority. The delay of the salvors to enforce their claim by an immediate seizure of the ship upon her arrival in the port of safety was because of an understanding, in good faith entertained by them, as well as by the master of the ship, that the voyage was not to be abandoned, and that the salvage would be paid without litigation. Acting upon that belief, the salvors delayed instituting a suit for salvage until the 17th day of January, 1891, when the vessel was abandoned by her owners, but in my opinion they did not thereby lose or impair the lien which they had upon the ship. The maritime law gives salvors a lien upon the ship saved in order that it may be unnecessary for salvors to maintain possession of the property saved in order to secure payment of their demand. It assumes a surrender of the property to its owner, and a certain amount of delay in payment, without impairment of the salvors' lien. Of course a salvors' lien may be lost or impaired by improper or unnecessary delay, and when delay gives opportunity to the master of the ship to incur other debts upon the credit of the ship, it might be that the right of priority over such debts would be held to be lost by delay, if the delay could be found unreasonable or unjustifiable. But that cannot be found in this case. The delay on the part of these salvors did not arise from any improper demand of salvage on their part, nor from any unwillingness on the part of the ship to pay a proper salvage; on the contrary, the salvage was agreed on, and would have been paid if the discovery of the condition of the vessel's bottom, up to that time unsuspected, had not forced the owners to abandon the vessel and the voyage. Up to that time all was in good faith and without objection, and, but for that unexpected discovery, doubtless no difficulty would have arisen. To hold that such a delay under such circumstances impaired in any way the salvors' right, would, in effect, require salvors to take immediate proceedings against the vessel, in order to maintain the salvors' lien. Such a rule would, in my opinion, be contrary to the spirit of the maritime law, would tend to increase expenses and litigation, and should not be adopted.

I am of the opinion, therefore, that the wages of the seamen, which are nailed to the last plank of the ship, and which under no circumstances contributed to the general average, as well as the salvage demand, are entitled to priority in payment over the demands of the other libelants, no one of whom, it will be observed, in any degree added by their services to the value of the vessel, or in the slightest degree increased the fund realized from her sale. It is a case of some hardship to the material-men, no doubt, but no greater than in the ordinary case, where the vessel proves insufficient in value to pay her bills. The hardship in this case arises, not from any fault on the part of the salvors or the seamen, but from the fact that the material-men furnished what they did to a vessel so largely incumbered by liens superior in grade to their de-

mands. As the fund is sufficient to pay the seamen and the salvors in full, no question of priority arises between their demands. The wages of the crew and their costs will therefore be first paid, then the demand of the salvors and their costs, and what remains will be distributed among the other libelants, in proportion to their respective demands.