**UNITED STATES v. THE POMARE et al.**
Admiralty No. 428.

United States District Court
D. Hawaii. First Division.
Aug. 14, 1950.

Norman K. Chung, Honolulu, T. H., King & McGregor, Honolulu, T. H., James A. Leavey, Honolulu, T. H., for claimants.

Ray J. O'Brien U. S. Atty., District of Hawaii, Honolulu, T. H., and Winston C. Ingman, Asst. U. S. Atty., Honolulu, T. H., for libelant.

METZGER, District Judge.

1. *Statement of the Case.*

On March 3, 1950, the United States of America filed in this Court a libel in rem and in personam against the Oil Screw Vessel Pomare and the South Seas Shipping Company, Ltd., the recorded owner of the ship. The libel recited that on February 4, 1948, the shipping company executed and delivered to the libelant, for a valuable consideration, a promissory note bearing that date, in the principal sum of $37,500, with interest at 4% per annum from date. The note is payable in 36 monthly installments, the final installment falling due on February 4, 1951.

The libel further alleged that on June 8, 1948, in order to secure the payment of the note, the respondent shipping company, in accordance with the Ship Mortgage Act of 1920, as amended, 46 U.S.C.A. §§ 911–984, executed and delivered to the libelant a preferred marine mortgage covering the respondent vessel. Both note and mortgage are attached to the libel as exhibits.

After formal recitals as to recordation, endorsement, affidavits of good faith, and the like, the libel sets forth that there now remains due and unpaid on the principal of the note the sum of $20,000, together with interest. According to the testimony of Hyman Wongham, president of the respondent corporation, the accrued interest amounted to $338.65, as of February 4, 1950.

Electing to declare this entire balance of $20,000, together with the unpaid interest thereon, to be "immediately due and collectible," the libelant prays that the Pomare be condemned and sold, after notice to all persons claiming any interest therein, to pay the libelant's claims; and that the preferred marine mortgage be declared a valid and existing lien upon the vessel superior to all save "preferred maritime liens".

In its answer, the respondent corporation admits the libel's allegation as to the principal amount due, $20,000, but leaves the libelant to its proof as to the amount due on a certain installment date, not material here.

In accordance with a writ of venditioni exponas issued under the authority of this Court on March 24, 1950, the Pomare was sold at public auction by the United States Marshal at Honolulu to Juan Perlo, of Los Angeles, California, the highest bidder, for $24,000, on April 14, 1950. This Court confirmed the sale on April 20, 1950.

Many petitions in intervention have been filed herein by creditors of the respondents.

Since the proceeds of the public sale are insufficient to satisfy completely the claims of even the preferred creditors, the discussion that follows will be confined to an inquiry into the order of priority among such creditors alone.

2. *The Priority of the Claims of the Seamen over Those of the Government.*

The two classes of claims that are the leading contenders for the spoils of the Pomare are those of the seamen and those of the United States Government. Indeed, the available sum of $24,000 will not be sufficient to satisfy both groups of claims in full.

The demands of the crewmen are bottomed upon unpaid wages. Those of the United States are based upon (1) various taxes owed to the Collector of Customs and the Collector of Internal Revenue; and (2) the preferred marine mortgage. All these preferred claims are sufficiently itemized in the Recapitulation, infra.

(a) *The Rank of the Federal Tax Claims.*

We will first consider the standing that the tax claims of the United States have vis-a-vis the wage claims of the crew.

A. *The Rank of the Government's Tax Liens Depends Upon Statute.*

■ It is well settled that the claim of the Government for taxes does not stand upon any conception of sovereignty but upon specific statutory authority.

This principle goes back to the earliest reaches of American jurisprudence. In United States v. State Bank of North Carolina, 1832, 6 Pet. 29, 35, 8 L.Ed. 308, Mr. Justice Story said: "The right of priority of payment of debts due to the government, is a perogative (sic) of the crown well known to the common law. It is founded not so much upon any personal advantage to the sovereign, as upon motives of public policy, in order to secure an adequate revenue to sustain the public burdens, and discharge the public debts. *The claim of the United States, however, does not stand upon any sovereign perogative (sic) but is exclusively founded upon the actual provisions of their own statutes.*" (Emphasis supplied).

See also In re Wyley Co., D.C.Ga.1923, 292 F. 900, 901; City of Winston-Salem v. Powell Paving Co., D.C.N.C.1934, 7 F. Supp. 424, 428.

B. *The Absolute Priority Given to the Government by 31 U.S.C.A. § 191 Does Not Apply Here.*

(a) *The Statute.*

■ Section 191 of Title 31 U.S.C.A., reads as follows:

"*Section 191. Priority established.* Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

(b) *The Taxpayer Herein Is Not "Insolvent" Within the Purview of the Foregoing Section.*

While it was generally conceded by all sides during oral argument that the taxpayer herein—the South Seas Shipping Company, owner of the "Pomare"—does not have sufficient resources with which to meet its debts, the Company is not "insolvent" within the meaning of Section 191, supra.

The definition of "insolvency" within the ambit of that statute was thus expounded in Bramwell v. United States Fidelity & Guaranty Company, 269 U.S. 483, 487-488, 46 S.Ct. 176, 177, 70 L.Ed. 368: "The act applies to all debts due from deceased debtors whenever their estates are insufficient to pay all creditors, and extends to all debts due from insolvent living debtors *when their insolvency is shown in any of the ways stated in section 3466* (31 U.S.C.A. § 191). The decisions of this court show that no lien is created by the statute; that priority does not attach while the debtor continues the owner and in posses-

sion of the property; *that no evidence can be received of the insolvency of the debtor until he has been divested of his property in one of the modes stated;* and that 'whenever he is thus divested of his property, the person who becomes invested with the title, is thereby made a trustee for the United States, and is bound to pay their debt first out of the proceeds of the debtor's property.' (Cases cited)" (Emphasis supplied).

(c)  *Conclusion.*

From the foregoing, it is clear that the absolute preference given to the United States because of a tax lien is not present in the instant case.

C.  *Section 3670 of the Internal Revenue Code Does Not Establish Priorities.*

(a)  *The Statute.*

█  Section 3670 of the Internal Revenue Code, 26 U.S.C.A. § 3670, reads as follows: "§ *3670.  Property subject to lien.*

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, penalty, additional amount, or addition to such tax, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

(b)  *This Section Does Not Give the Government a Preference.*

It will readily be seen that Section 3670 does not give the United States a preferred lien upon the property of the taxpayer.  In City of Winston-Salem v. Powell Paving Co., supra, 7 F.Supp. at page 428, the Court said: "The lien established by section 3186 (26 U.S.C.A. § 3670) is a general lien upon all the property of the taxpayer, and resembles, in many respects, a mortgage.  While it is a lien, it is not necessarily to be preferred over any other lien."

See also Exchange National Bank of Tulsa v. Davy, D.C.Okl.1936, 13 F.Supp. 226, 229.

D.  *Nor Does the Ship Mortgage Act Establish the Priority of a Federal Tax Lien.*

█  A reading of Section 953 of Title 46, which is part of the Ship Mortgage

Act of 1920, discloses that, while "preferred maritime liens", *including those for crewmen's wages,* are there given high priority no mention is made of tax liens:

"§ *953.  Preferred maritime lien; priorities; other liens.*

"(a) When used hereinafter in this chapter, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, *for wages of the crew of the vessel,* for general average, and for salvage, including contract salvage.

"(b) Upon the sale of *any mortgaged vessel* by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preexisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the *preferred mortgage lien shall have priority* over all claims against the vessel, *except (1) preferred maritime liens,* and (2) expenses and fees allowed and costs taxed, by the court." (Emphasis supplied).

E.  *A Seaman's Priority Is Established by Admiralty Law.*

█  It is to the law of the sea, then, that we must turn to resolve this vexing question of the status of a seaman's wage lien vis-a-vis a Federal tax lien, under Section 953 of the Ship Mortgage Act, supra, and Section 3670 of the Internal Revenue Code, supra.

(a)  *"The Wards of the Admiralty".*

From time immemorial, seamen have been regarded as "the wards of the admiralty". In Gerber v. Spencer, 9 Cir., 1922, 278 F. 886, 890, our Court of Appeals said: "The general rule that rights of other creditors are subordinate to claim for wages is applicable.  The rights of seamen have al-

ways been cautiously guarded by statutes and the courts should make their decrees in accord with the spirit and intent of the law to protect the seaman."

See also Saylor v. Taylor, 1896, 4 Cir., 77 F. 476, 478; The Samuel Little, 2 Cir., 1915, 221 F. 308, 310-311; The Fort Gaines, D.C.Md.1927, 18 F.2d 413-414; The Herdis, D.C.Md.1927, 22 F.2d 304, 306; The General Lincoln, D.C.Md. 1928, 24 F.2d 441, 442; Clifford v. Merritt-Chapman & Scott Corporation, 5 Cir., 1932, 57 F.2d 1021, 1024; The Eastern Temple, 4 Cir., 1938, 94 F.2d 374, 376; Hume v. Moore-McCormack Lines, 2 Cir., 1941, 121 F.2d 336, 337-338, certiorari denied, 314 U.S. 684, 62 S.Ct. 188, 86 L.Ed. 547; Krey v. United States, 2 Cir., 1941, 123 F.2d 1008, 1010; The Herbert L. Rawding, D.C. S.C.1944, 55 F.Supp. 156, 161; Benedict on Admiralty, Sixth Edition, Vol. 4, Section 621.

(b) *"To the Last Plank."*

For more than a century, American judges have repeatedly held that a seaman's lien for wages "is so sacred and indelible, that * * * it adheres to the last plank of the ship."

Such was the language used by Mr. Justice Story in Sheppard v. Taylor, 1831, 5 Pet. 675, 710, 8 L.Ed. 269.

See also The Virgin, 1834, 8 Pet. 538, 553, 8 L.Ed. 1036, where Mr. Justice Story said "that the seamen have a prior lien on the ship for their wages, and that the amount of the wages ought first to be deducted"; The J. E. Rumbell, 1893, 148 U.S. 1, 9, 13 S.Ct. 498, 37 L.Ed. 345; The John G. Stevens, 1898, 170 U.S. 113, 119, 18 S.Ct. 544, 42 L.Ed. 969; Collie v. Fergusson, 1930, 281 U.S. 52, 54, 50 S.Ct. 189, 74 L.Ed. 696; The J. A. Brown, D.C.Mass., 1876, 13 Fed.Cas. 186, 187, Case No. 7,118; The Paragon, D.C.Me., 1836, 18 Fed.Cas. 1084, 1088, Case No. 10,708; The Graf Klot Trautvetter, D.C.S.C., 1881, 8 F. 833, 834; The Guiding Star, D.C.Ohio, 1881, 9 F. 521, 525; The Virgo, D.C.N.Y., 1891, 46 F. 294, 296; The Lillie Laurie, C.C.Tex., 1880, 50 F. 219, 221; The William Leishear, D.C. Md., 1927, 21 F.2d 862, 863; The Chester, D.C.Md., 1928, 25 F.2d 908, 909; Butler v.

Ellis, 4 Cir., 1930, 45 F.2d 951, 955; Slavin v. Port Service Corporation, 3 Cir., 1943, 138 F.2d 386, 387; The Diane, D.C.Fla., 1942, 45 F.Supp. 510, 512; 56 C.J. 1053, Seamen Sections 514, 515.

(c) *Not Even a Forfeiture in Favor of the Government Deprives the Seaman of This Last Plank.*

A forfeiture of the vessel to the United States does not deprive the seaman of this lien priority. In the leading case of The St. Jago de Cuba, 1824, 9 Wheat, 409, 417, 6 L.Ed. 122, the Court said: "We concur, then, in the opinion of the court below, that the fair claims of seamen, and subsequent materialmen, are not over-reached by the previous forfeiture."

See also The Siren, 1868, 7 Wall. 152, 159-160, 19 L.Ed. 126; North American Commercial Co. v. United States, 9 Cir., 1897, 81 F. 748, 749-751; 56 C.J. 1054, Seamen Section 524.

(d) *Nor Does a Government Lien for Penalties So Deprive Him.*

In The Jennie Hayes, D.C.Iowa, 1889, 37 F. 373, 374-375, it was said: "If, however, the seamen are entitled to a lien for their wages, then such lien, under the rule recognized and enforced by the supreme court * * *, is superior and paramount to that of the United States. Upon the facts disclosed upon the record in this cause it must be held that the seamen have a lien upon the proceeds of the vessel for the wages due them, and that such liens are entitled to priority over the claim of the government (for penalties.)"

See also The Atlanta, D.C.Ga., 1948, 82 F.Supp. 218, 221, 240; 56 C.J. 1054, Seamen, Section 524.

F. *Conclusion.*

The foregoing authorities establish that, in the absence of specific statutory provision to the contrary, a seaman's "preferred maritime lien" primes the Government's lien for taxes; and this Court so rules.

(a) *The Preferred Mortgage Lien.*

As we have seen, 46 U.S.C.A. § 953(b) provides that "The preferred mortgage lien shall have priority over all claims against

the vessel, except (1) preferred maritime liens, * * *" It has already been pointed out that tax liens are not classed as "preferred maritime liens", while wage liens are so considered.

It therefore follows that the wage liens not only prime the tax liens but also the Government preferred maritime lien; and that, of the two classes of claims filed by the United States, the mortgage lien has priority over the tax liens.

This entire subject has been so fully treated under the sub-heading dealing with the tax liens, that further discussion is deemed unnecessary.

### 3. *Claim of Donald R. Dady.*

■ An intervening libel to enforce a maritime lien has been filed herein by Captain Donald R. Dady, master of the Pomare. The claim sets forth that on October 10, 1948, at Honolulu, Dady signed shipping articles "or was employed as Master" of the vessel, at a wage of $700 per month; that on April 18, 1949, he was employed as Master "at a wage of $500 per month"; that "while employed as Master" he was required to perform the duties of watch officer while the vessel was at sea and the duties of security officer while she was in port, because there was insufficient personnel on board duly licensed to serve as such officers, etc.

Dady's counsel concedes that as master of the Pomare Dady could not claim a lien. It is contended, however, that he is entitled to a seaman's lien because he performed the duties of a seaman "in conformity with maritime regulations and to preserve the security and safety" of the vessel.

It is significant, however, that in his intervening libel Dady does not attempt to segregate the salary of a watch officer or of a security officer from that of a master. On the contrary, he claims a flat $500 per month, which was his salary as master under the shipping articles of April 18, 1949.

Indeed, his counsel, during the oral argument frankly admitted that, if the company were solvent, Dady would have claimed wages as a master. In other words, this theory of double or triple duty has been evolved out of the exigencies of the present situation. This is made clear in the following colloquy between court and counsel:

"The Court: Well, while he was acting as watch officer, did he relinquish his duties as master?

"Mr. Leavey: There were no master's duties to perform.

"The Court: He kept no log?

"Mr. Leavey: Yes, my understanding is, your Honor, he kept the necessary log and performed the duties of a master.

"The Court: Well, then, he was both master and watchman?

"Mr. Leavey: That is correct. He was master because he was designated as such on the articles.

"The Court: And as master he designated himself as watch foreman?

"Mr. Leavey: For the simple reason, your Honor, that there was no other person to perform the duties for the security of the ship. He just could not walk off and leave the ship alone.

"The Court: Well, he still held his job as master, why couldn't he have performed the duties of watch officer when he had no watch officer and it would be uneconomical to employ one?

"Mr. Leavey: If I understand your question, your Honor: He performed the duties, why did he not perform the duties of watch officer during the period that it was necessary for him to do so?

"The Court: Yes.

"Mr. Leavey: That is exactly what he did. He could not hire on another hand because the company was in financial difficulty, and they themselves were not being paid. The master himself was not being paid at that time for any of his services.

"The Court: Well, now if the ship and its owners hadn't gotten into a distressful situation where they couldn't pay out, what wages would the master have claimed, claimed wages as master or claimed wages as watch officer?

"Mr. Leavey: In a claim against the company itself, presuming the company was solvent?

"The Court: Yes.

"Mr. Leavey: He obviously, your Honor, would have claimed wages as a master, and I don't think there is any question about that.

"The Court: But not both?

"Mr. Leavey: Not both from the company. I agree. But now he is faced with the situation where he has to secure his compensation prior to the lien of the Government. As a master he cannot come in as a priority lien holder, but as a crewman performing a crewman's duties, he does have that priority which must be awarded him in order to claim for the actual duties performed as a crewman."

Nor do the cases relied upon by Dady support his position, for they may be distinguished on the facts. Counsel especially stressed the case of Vlavianos v. The Cypress, 4 Cir., 1948, 171 F.2d 435, 439-440, certiorari denied, 337 U.S. 924, 69 S.Ct. 1168, 93 L.Ed. 1732, particularly the following language found therein: "It is contended that the master should have been allowed a lien for services rendered under his oral contract under which he was to be radio operator as well as master. It has been held that one who performs the services of a member of a crew, *although designated as master,* takes himself out of the well settled rule that a master is entitled to no lien for his wages. Swift v. Knowles, 5 Cir., 100 F.2d 977; Burdine v. Walden, 5 Cir., 91 F.2d 321; Wandtke v. Anderson, 9 Cir., 74 F.2d 381; Owen v. United States, 1945 A.M.C. 595; The Herdis, D.C.D.Md., 22 F.2d 304." (Emphasis supplied).

In the instant case, however, Dady was not only "designated as master", but, according to his own pleadings, was "employed as master", and, according to his own counsel, "kept the necessary log and performed the duties of a master".

Most of the cases cited in the Vlavianos case, supra, can likewise be distinguished. In Swift v. Knowles, supra, Knowles spoke "of himself captain, but it appears that he was the crew also": [100 F.2d 978.] He constituted "the entire crew of this small boat". In Burdine v. Walden, supra, the court entertained "no doubt that Walden was employed as master", [91 F.2d 322.]

but that "The yacht was out of commission and laid up in her home port", and that "the services rendered by libelant during that period were merely those of a watchman", for which he would not be entitled to a lien in admiralty. In Wandtke v. Anderson, supra, the late Senior Judge Garrecht, of this Circuit, held that Arthur Oakley, although described as "master", "was nothing more than a foreman, and as such comes within the category of a seaman" [74 F.2d 384.] In The Herdis, supra, the court held that "The fact that these men *formerly* served on the same vessels in the capacity of master does not affect their present rights." [22 F.2d 306.] (Emphasis supplied).

Distinguishing the case of The Herdis, supra, from the case then before it, the Court, in The Herbert L. Rawding, supra, D.C.S.C., 55 F.Supp. 156, 160, said: "The master here distinctly testified that he continued as master and that his status never changed. It may seem hard that when he stayed by his ship he should not be paid, but under the law the master is the representative of the owner and he is not in a position to claim a lien upon the very property which he is holding in a representative capacity. The master's claim must be denied in toto."

Although the ancient lordship of a master over his vessel has been somewhat abated in modern times, there has been no change in the general rule that the captain of a ship cannot stop to measure, with an apothecary's scales, his duties as compared with those of an ordinary seaman, when the needs of the boat make pinch-hitting necessary. If there is a seam to be calked, and there is no one else around to calk it, the master must do the job. If there is a sail to be reefed, and the vessel is shorthanded, he must lend a hand. If there is cargo to be jettisoned, and the crew is otherwise engaged in trying to save the ship, he cannot fold his hands and say, "That is not my department; let the old tub sink, for aught I care!"

Nor, if he decides to perform these extra chores, can he send the owners an extra bill for overtime, or time and a half, or any

other form of extra pay. It's all in the day's work.

The skipper's duties are well epitomized in 58 C.J. 274, Shipping Sections 372, 373:

"The master has control of *all* departments of *service* on his ship, and full discretion as to its navigation. He must determine what is requisite for the safety of property and lives on his vessel. It is his duty *personally* to see to the course of the vessel, and to see that the officers and crew under him properly perform their assigned duties with respect to the navigation of the vessel. This rule applies to harbors or rivers, when for the time being a pilot is in charge of navigation and the pilot or other officer so in charge of navigation does not supersede the master in command. The master is responsible civilly and, under some statutes, criminally for any misconduct or neglect on his part.

"It is the duty of the master to use reasonable care, diligence, and *skill* to keep the ship in such repair as to make its conditon seaworthy in consideration of the interest of all concerned." (Emphasis supplied).

Heavy responsibilities, these; but responsibilities and burdens are the lot of those who possess power:

" 'Tis the plague of great ones;

Prerogativ'd are they less than the base."*

Such is the code of the sea.

Dady's claim to a maritime lien to cover the amount due on his salary is denied.

■ On a different footing, however, stands Dady's claim for reimbursement of $46.48 deposited by him with the Clerk of this Court in payment of a claim for wages against the vessel in the case of Minicola et al., v. AMV "Pomare", D.C., Adm. No. 427.[1] This sum, paid by Dady at the request of the owner of the vessel, constitutes a preferred maritime lien in Dady's favor, and reimbursement therefor is hereby allowed, as a priority claim.

4. *The Claim of Hyman Wongham.*

■ A claim of a preferred maritime lien against the Pomare has been filed by Hyman Wongham, president, general manager, director, and holder of the majority of the paid-in stock of the South Seas Shipping Co., Limited, owner of the vessel.

As his first cause of action, Wongham claims a lien for having paid the wages of certain crew members on dates ranging from October 15, 1948, to December 3, 1948, in a total sum of $8,661.49. The second cause deals with similar payments from April 18, 1949, to August 20, 1949, totaling $5,432.72. The third cause of action relates to an alleged payment made by Wongham to Daniel Laureto and others, members of the International Longshoremen's and Warehousemen's Union, on liens having arisen from unpaid wages due such persons for services rendered as stevedores employed directly by the master of the Pomare, as of August 9, 1949, totaling $492.71. The grand total of the three claims is $14,586.92.

In the first part of his testimony, Wongham stated that he purchased stock about the middle of September, 1948 in sufficient quantities to put him "in a position to operate the Company"; that on the three dates covered in his petition for intervention herein—December 3, 1948, August 20, 1949, and August 9, 1949—he was the holder of majority stock control "for the amount paid in"; that in the latter part of October, 1948, he was elected president and general manager of the company; that in his office in a former base yard in Honolulu, he thereafter carried on the business of the company until March, 1949, when he relinquished his lease at the base yard. Wongham received no salary.

On redirect examination twelve days later, Wongham testified that he might have been wrong about having been elected president and general manager in October, 1948. He identified a book containing the minutes of the meetings of the Company's stockholders and board of directors, which purported to show that he was so elected on March 29, 1949—several months after many of his payments to crew members were made.

The precise date of Wongham's election as president and general manager, however,

---

* Othello III, iii 273–274.

1. Case discontinued, no opinion filed.

is not important here. Administering equitable principles, a court of admiralty looks through form and into substance. Wongham's entire testimony clearly establishes that throughout the entire period here involved, he was the actual directing head of the corporation. In September, 1948, he purchased stock to put himself in position to operate the Company. In October, 1948, he had "the idea in mind to go out and collect the rest of the stock subscribed to". During the period covered by the first cause of action, he paid the money to the seamen to "keep the Company going or keep the ship * * * out of the court so that a possible sale or possible operation of the ship is foreseeable."

And even after he had identified the minutes referred to above, he admitted on the stand that he actually performed the work of running the business of the Company from September, 1948.

The homely adage is indeed here applicable; If an animal looks like a duck, walks like a duck, and quacks like a duck, one is justified in assuming that it *is* a duck.

Wongham was the actual head of the Company, for "whom the operation of the ship was the prime purpose". When creditors "were pounding on the door"—to use one of his favorite expressions—he paid the men off.

The following testimony, brought out on redirect examination, indicates that Wongham looked to the credit of the corporation and not to the ship for reimbursement for his payments to crewmen:

"Q. Did you ever at any time, Mr. Wongham, at the time you were making these advances, look to the general credit of the corporation for repayment of these sums?

"A. Well, that was assumed but I did not press a demand. It was mentioned.

"Q. What I am getting at is, did you look to the general credit of the corporation, the corporation treasury to make payment to you?

"Mr. Ingman: Objection. It calls for a conclusion of the witness rather than stating the facts.

"Mr. Chung: It states his intention at the time he made the payments as to whether he looked to this treasury, which has already been testified to, the state of which has already been testified to, the state of mind I think is important at the time he is making the advances.

"The Court: What is that question? (The Reporter read the last question)

"The Court: Overruled.

"Mr. Chung: Will you answer the last question, please?

"A. Yes."

All the receipts of the company came to his office from October, 1948, until he moved. The testimony is clear that he handled the financial affairs of the company. Under such circumstances, Wongham is not entitled to subrogation. He was looking for his profit from the dividends to be realized.

When a creditor relies upon his ability to pay himself out of the company's funds instead of looking to the ship for security, he is not entitled to a lien. The Murphy Tugs, D.C.Mich.1886, 28 F. 429, 432. This is particularly true when he is "a director and actively engaged in transacting the business, involving both the company's finances and its use of the vessel." The Cimbria, D.C.N.J.1914, 214 F. 131, 133.

See also The Gyda, D.C.Me., 1916, 235 F. 266, 268-269. The Natchez, D.C.La., 1916, 236 F. 588, 590-591; The Puritan, D.C. Mass., 1919, 258 F. 271, 272; The Frank Brainerd, D.C.Me., 1925, 3 F.2d 664, 665; The Kongo, 6 Cir., 1946, 155 F.2d 492, 495, certiorari denied, 1946, 329 U.S. 735, 67 S.Ct. 99, 91 L.Ed. 635; Barnes v. The Kongo, 6 Cir., 1949, 174 F.2d 67, 68; 55 C.J.S., Maritime Liens, §§ 24–25, pages 746, 747.

Accordingly, Wongham's petition in intervention is denied.

### 5. Claim of Robert S. Mills.

A claim for $9,615.19 as a preferred maritime lien against the Pomare has been filed in intervention by Robert S. Mills. During oral argument, petitioner's

counsel amended the amount to read $9,-636.93.*

In two indentures between Mills and the South Seas Shipping Company, Limited, operator of the Pomare, the former was appointed "irrevocable agent" of the latter to handle "all matters" in connection with two projected voyages of the motor vessel to California in 1949. For present purposes, the two agreements are substantially similar, unless otherwise specified herein.

In each contract, Mills agreed to pay certain of the Company's bills, including unpaid wages then due to officers and crew of the Pomare. In the second agreement, that of September 19, 1949, Mills also undertook to pay such wages accruing during the voyage contemplated in that agreement.

Mills bases his claim upon wage payments that are alleged to have been made by him to satisfy preferred maritime liens existing on or about August 24, 1949, the date of the agreement covering the first voyage.

Under each contract, Mills was to pay the specified bills owed by the Company, from freights collected by him for the respective voyages, and "from funds advanced by Mills for such purpose, if and as necessary, any sums so advanced by Mills to be repaid to him from sums obtained by him" as freight collections. He was to receive for his services 10% of the gross revenues received for cargo carried. All sums due him could be withheld by him from moneys collected by him as freight charges. The second contract also involved moneys collected for the carriage of passengers as well as cargo.

Much was said during the oral argument regarding the right of a special agent or a general agent of a vessel to be subrogated to the claims of holders of preferred maritime lines satisfied by him. The pivotal question here, however, is not whether Mills was a special or a general agent, but whether he was looking to the vessel as his security or relying upon his own handling of the company's funds for his reimbursement. It is this power or self-reimbursement that determines whether the creditor looks to the ship or to the revenues for his security.

In The Murphy Tugs, supra, D.C.Mich., 1886, 28 F. 429, 432, Judge Brown, the distinguished admiralty jurist, thus stressed the supremacy of *actualities* over *labels*:

"I do not think the mere fact that he was a director and stockholder would necessarily prevent his contracting with the company, or from acquiring a lien upon the property. But his position as the legal custodian of its funds is strong evidence to show that he relied upon the personal credit of the company, *or, rather, upon his ability to pay himself out of its funds, and his lien should therefore be postponed to that of the other creditors.*" (Emphasis supplied).

In W. A. Marshal & Co. v. President Arthur, 1929, 279 U.S. 564, 571, 49 S.Ct. 420, 422, 73 L.Ed. 846, a case apparently not noticed by counsel, the Court quoted with approval the following language by Mr. Circuit Justice Miller in Taylor v. Commonwealth, 1875, 23 Fed.Cas. 756, 757, No. 13,787:

"It is very clear to me, here, that (the libellant) in making this contract, never intended to rely on the security of the vessel itself, because he made this contract for the very best kind of other payment. * * * I think, having made an express contract for an express security, he cannot say, 'I did this work on the credit of the vessel.' In other words, I think if there is any question of admiralty lien, * * * that it must have been the intention in the mind of the party who furnishes the supplies and repairs whether in a home or foreign port, to rely on the credit of the vessel * * * If it can be shown that he did not rely on that *alone,* and that he intended to rely on other security, which he supposed sufficient, or which was supposed to be better, then he had no lien, because the lien arises from implication, from the fact expressed or implied that the man in furnishing the supplies or contracting a debt, relied on the vessel as security, and if he relied on anything else it is another

---

* In his testimony, petitioner had previously reduced the original amount to $9,614.43.

security sufficient, or supposed to be, which, in case that turned out to be insufficient, does not restore his lien." (Emphasis supplied).

See also Barnes v. The Kongo, 6 Cir., 1949, 174 F.2d 67, 68.

In the instant case, there is abundant evidence not only from the contracts themselves but from the petitioner's own testimony that he relied for his security neither upon the vessel itself nor upon the credit of the Company, *but upon his ability to make the two voyages pay:*

"Q. * * * How did you intend to get that money back?

"A. Well, it was quite simple. I wouldn't have taken hold of the ship unless I had the load both ways. I had guaranteed cargoes of full capacity before we ever left here for San Francisco out, and the ship's master will tell you we left over half the pineapple available to us here when we departed. I had both ends tied up before I ever stepped into the picture.

"Q. In other words, you intended, provided in the agreement at the top of page 3, that any sums advanced by Mills would be repaid to him from sums obtained by him as provided in paragraph 1 above, paragraph 1 being the paragraph where you were permitted to collect all moneys for cargo?

"A. That's right.

"Q. In other words, you intended, at the time you advanced this money, to get it out of the proceeds of the voyage, quite naturally; is that right?

"A. That's right, plus a small profit.

"Q. And you expected, then, I take it to get in excess of $14,000 back from this trip for cargo charges; is that correct?

"A. Why, yes, I think the total thing totaled—

"Q. What was your estimate at that time?

"A. I believe it was around $24,000 for the round trip, 22 to 24 thousand."

The same thought runs like a leitmotif throughout the petitioner's testimony.

Accordingly, I hold that Mills has not established his right to be subrogated to the wage liens that he satisfied. His petition is denied.

6. *Recapitulation of the Order of Priority.*

Accordingly, the Court finds that the order of priority among the various preferred lienholders is as follows:

| Rank | Claimant | Claim Proved |
|------|----------|-------------:|
| 1 | Seamen's Wage Liens | |
| | (a) Edward Okamura | $ 743.40 |
| | (b) Clarence Leandro | 1,039.05 |
| | (c) A. Ornellas | 89.30 |
| | (d) Henry Keola | 67.08 |
| | (e) Tokuichi Ohara | 11.08 |
| | (f) Harvey Lindsey | 65.08 |
| | (g) Rufus Horswell | 91.98 |
| | (h) Richard DeRego | 68.89 |
| | (i) Charles Musser | 94.00 |
| | (j) Henry Keliikipi | 15.00 |
| | (k) Harry Franson | 119.99 |
| | (l) Harold H. Brown | 278.32 |
| | (m) Raymond A. Sharon | 197.00 |
| | (n) Otto B. Landgraf | 348.32 |
| | (o) Donald R. Dady | 46.48 |
| | Total | $3,274.97 |
| 2. | U. S. War Assets Administration (Mortgagee) Principal | $20,000.00 |
| | Accrued Interest to 2/4/50 | 338.65 |
| | Interest at 4% from 2/4/50 | —— |
| 3. | U.S. Collector of Customs | $ 8.00 |
| 4. | U.S. Collector of Internal Revenue (including lien filing fees of the Territorial Bureau of Conveyances and of the U.S. Customs Office) | 4,861.13 |

The proctors for the United States and for the various seamen whose wage claims have been accorded priority herein will draw up Proposed Findings of Fact, Conclusions of Law, and Form of Decree in accordance with this opinion, and will submit them to the Court for approval. Costs of court and its administration a first charge.